IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHARLES R. GOLDSTEIN,
Chapter 7 Trustee for K Capital
Corporation,

     *Plaintiff*,

     v.                             Civil Action No. ELH-11-1604

FEDERAL DEPOSIT INSURANCE
CORPORATION,
Receiver of K Bank,

     *Defendant*.

## MEMORANDUM OPINION

Charles R. Goldstein (the "Trustee"), plaintiff, is the Chapter 7 Trustee in Bankruptcy for K Capital Corporation ("K Capital"), a Maryland corporation that, in November 2010, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. *See* Complaint ¶ 1 (ECF 1); *see also In re K Capital Corp.*, Case No. 10-35540 (Bankr. D. Md.). K Capital is a "bank holding company" that wholly owned a Maryland bank, K Bank, as its subsidiary. Complaint at 1 & ¶ 6. K Bank is now under the receivership of the Federal Deposit Insurance Corporation ("FDIC"), defendant. *Id.* ¶ 2.

The Trustee filed suit[1] against the FDIC, in its capacity as receiver, seeking damages of at least $20 million and other relief stemming from an alleged "scheme" of coordinated lending by K Capital and K Bank. The scheme purportedly was designed to permit K Bank to extend financing to borrowers at extraordinarily high aggregate loan-to-value ratios of between 95% and over 100%—ratios that K Bank could not have achieved on its own under its charter and within "standard underwriting policies" and "regulatory constraints" applicable to K Bank as a "regulated banking institution." Complaint ¶¶ 7-9.

---

[1] Mr. Goldstein filed his complaint *pro se*, but is now represented by counsel.

The FDIC has filed a Motion to Dismiss (ECF 9), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Motion has been fully briefed,[2] and no hearing is necessary to resolve it.  *See* Local Rule 105.6.  For the reasons that follow, I will grant the Motion in part and deny it in part.

### Factual Background

Under the alleged lending "scheme," K Bank would typically lend a borrower between 80% and 90% of the value of real estate used as collateral to secure the loan, and would obtain a first-priority lien on the real estate collateral.  *Id.* ¶ 13.  Simultaneously, K Capital would extend a further loan to the borrower in an amount between 5% and 15% of the value of the collateral, and would receive a second-priority lien on the collateral.  *Id.* ¶ 14.  K Bank then would act as the servicer for both loans.  *Id.* ¶ 16.

The "scheme was fraught with risk" because the borrowers' collateral was so highly leveraged.  *Id.* ¶ 9.  According to the Trustee, the risk fell "disproportionately on K Capital" because, if a borrower defaulted (and the Trustee alleges that the "majority" of the borrowers defaulted), K Capital's junior lien position meant that K Capital would recover nothing until and unless K Bank was repaid in full.  *Id.* ¶ 9; *see id.* ¶¶ 10-23.  Moreover, the financing extended by K Capital "was not made with economic terms commensurate with the risk."  *Id.* ¶ 18.  The Trustee contends that the scheme was made possible because although the two entities were "nominally independent" of each other, they were "consolidated on an accounting and tax basis," *id.* ¶ 8, and the "boards of K Capital and K Bank were populated by the same individuals who made decisions for both entities, despite conflicting interests."  *Id.* ¶ 18.  "On information and belief," the Trustee contends that, at the time the loans were made, K Bank and K Capital agreed

---

[2] Along with ECF 9 and its supporting memorandum (ECF 9-1) (collectively, "Motion"), I have considered the Trustee's Opposition (ECF 14) and the FDIC's Reply (ECF 17).

to "share the proceeds of payments" from each pair of loans or from collateral *pari passu*, *i.e.*, in proportion to each entity's contribution to the total amount loaned to the borrower, at the time any proceeds were received. *Id.* ¶ 19.

Based on these allegations, the Trustee, in the exercise of his duty to administer the estate of K Capital for the benefit of its creditors, *see id.* ¶ 5, asserts five claims against the FDIC in its capacity as receiver for K Bank: unjust enrichment (Count I); promissory estoppel (Count II); declaratory judgment (Count III); constructive trust (Count IV); and accounting (Count V). All of the counts arise under Maryland common law, and are premised on the proposition that each pair of loans issued by the two entities as part of the alleged "scheme" should be treated as a *de facto* "joint loan," Complaint ¶ 11, and that the K Capital bankruptcy estate is entitled to recover from any proceeds of the subject loans received by the FDIC or K Bank in proportion to the amount of funding provided by K Capital for each "joint loan."[3]

This suit is, in some sense, a dispute by proxy. The Trustee stands in the shoes of K Capital, while the FDIC stands in the shoes of K Bank. Asserting the alleged rights of K Capital, the Trustee has lodged various claims against the FDIC, as receiver for K Bank.

---

[3] Subject matter jurisdiction is based on 12 U.S.C. § 1821(d)(6), which authorizes and establishes subject matter jurisdiction over a claim against the FDIC as receiver of a depository institution "in the district . . . court of the United States for the district within which the depository institution's principal place of business is located." A civil action under § 1821(d)(6) must be filed within sixty days after the FDIC's denial of the plaintiff's claim. Here, the Trustee's complaint does not expressly allege that the claim was submitted to the FDIC and denied. However, the parties appear to agree that the Trustee satisfied this condition precedent. Substantive state law ordinarily governs claims brought under 12 U.S.C. § 1821 against the FDIC as receiver of a failed financial institution. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) ("§ 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent [bank], to work out its claims under state law, except where some provision in [federal law] provides otherwise").

### Discussion

### A.  Standard of Review

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the Rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007) (citation omitted).  To be sure, the plaintiff need not include "detailed factual allegations in order to satisfy" Rule 8(a)(2).  *Id.* at 555.  But, the Rule demands more than bald accusations or mere speculation.  *Id.*  Thus, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient under the Rule.  *Id.*

A defendant may "'test the sufficiency of a complaint'" by way of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted).  A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that the plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Ordinarily, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of*

*the complaint*.'" *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, a Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011). Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief.'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted).

## B.  The *D'Oench, Duhme* Doctrine and 12 U.S.C. § 1823(e)

The FDIC's primary argument is that the Trustee's claims are barred by the federal common law *D'Oench, Duhme* doctrine and its statutory counterparts, 12 U.S.C. §§ 1821(d)(9)(A) and 1823(e).  The *D'Oench, Duhme* doctrine takes its name from the Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942).  That case involved a promissory note, originally held by a bank, that was acquired by the FDIC "in connection with the assumption of the [original bank's] deposit liabilities by another bank." *Id.* at 454.  When the FDIC sued to collect on the note, the maker of the note contended that it had "sold the [original] bank certain bonds which later defaulted," and that the promissory note had been "executed to

enable the bank to carry the note[ ] and not show any past due bonds" on its books. *Id.* Thus, the receipt for the note contained an alleged proviso: "'This note is given with the understanding it will not be called for payment.'" *Id.* at 454 (quoting receipt). The Supreme Court held that the purported agreement that the promissory note would not be repaid was unenforceable against the FDIC, pursuant to "a general policy" of federal common law "to protect the institution of banking from such secret agreements." *Id.* at 458. It said: "'Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in the form of a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.'" *Id.* at 459 (citation omitted). In the Supreme Court's view, "[p]lainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners." *Id.* at 460.

In *Young v. FDIC*, 103 F.3d 1180 (4th Cir.), *cert. denied*, 522 U.S. 928 (1997), the Fourth Circuit described the contours of the *D'Oench, Duhme* doctrine as it has subsequently developed:

> The *D'Oench* doctrine . . . "prohibits claims based upon agreements which are not properly reflected in the official books or records of a failed bank or thrift." *Resolution Trust Corp. v. Allen*, 16 F.3d 568, 574 (4th Cir. 1994). The doctrine serves two purposes. First, it allows federal and state examiners to rely on a bank's records in evaluating the institution's fiscal soundness. *Id.* at 574. Second, it "ensure[s] mature consideration of unusual loan transactions by senior bank officials, and prevent[s] fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Langley v. FDIC*, 484 U.S. 86, 92 (1987).
>
> The original test for determining whether claims were barred under the *D'Oench* doctrine was whether the agreement, oral or written, either was designed to deceive the public authority or would tend to have that effect. Courts, however, have expanded the doctrine, and it now applies in virtually all cases where the FDIC is confronted with an agreement not documented in the institution's records.

*Id.* at 1187 (some internal citations omitted).

In the Federal Deposit Insurance Act of 1950, as amended by the Financial Institutions

Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Congress "codified elements of

the common law *D'Oench Duhme* doctrine in 12 U.S.C.A. §§ 1823(e) and 1821(d)(9) in order to

protect taxpayer, depositors, and creditors of failed financial institutions and federal deposit

insurance funds." *Resolution Trust Corp. v. Allen*, 16 F.3d 568, 574 (4th Cir. 1994). 12 U.S.C.

§ 1823(e) provides, with exceptions not relevant here:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it . . . , either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

In addition, 12 U.S.C. § 1821(d)(9)(A) provides (with exceptions not relevant), that "any

agreement which does not meet the requirements set forth in section 1823(e) of this title shall not

form the basis of, or substantially comprise, a claim against the receiver or the Corporation."

The Fourth Circuit has explained that § 1823(e) "essentially codifies the common law

*D'Oench* doctrine," although "the two remain separate and independent grounds for decision."

*Nat'l Enters., Inc. v. Barnes*, 201 F.3d 331, 333 n.4 (4th Cir. 2000). Indeed, "the Fourth Circuit

and other courts often construe the *D'Oench* doctrine and section 1823(e) in tandem." *Young*,

103 F.3d at 1187. Here, the FDIC relies primarily upon the statutes. But, neither party contends

that the common law doctrine and its statutory counterparts should produce differing results.[4]

The FDIC argues that the Trustee's claims fail because they are predicated on an alleged "agreement" between K Capital and K Bank to share proceeds from the loans *pari passu*, and the Trustee's complaint does not allege that the purported "agreement" complies with the requirements of *D'Oench, Duhme* and the statutes.  *See* Motion at 12-14.  In response, the Trustee contends that *D'Oench, Duhme* and the statutes do not apply to this case for two reasons. First, according to the Trustee, the FDIC was appointed receiver of K Bank "by the Maryland Office of Financial Regulation, and not by a Federal banking agency."  Opposition at 26.  In that circumstance, claims the Trustee, *D'Oench, Duhme* and its statutory counterparts are made inapplicable by another statutory provision, 12 U.S.C. § 1821(g)(4), which provides that, when the FDIC is appointed as receiver by a state regulator, "the rights of depositors and other creditors of any State depository institution shall be determined in accordance with the applicable provisions of State law."  Second, the Trustee maintains that his claims do not depend on contradicting a written agreement with a secret unwritten agreement.  Rather, he asserts that "the written loan agreements themselves evidence the inequality of the arrangement between K

---

[4] The Fourth Circuit has continued to apply the federal common law *D'Oench, Duhme* doctrine, notwithstanding the enactment of FIRREA and the Supreme Court's decision in *O'Melveny, supra*, 512 U.S. 79, in which the Supreme Court held that claims against the FDIC as receiver are generally governed by substantive state law.  *See Young*, 103 F.3d at 1187; *see also Fed. Fin. Co. v. Hall*, 108 F.3d 46, 49 (4th Cir. 1997) (stating that "the *D'Oench, Duhme* holding may well fit into the 'few and restricted' cases that the Supreme Court in *O'Melveny* held do require federal common law rules of decision").  However, there is a division of opinion on the continued vitality of the common law *D'Oench, Duhme* doctrine among federal circuit courts of appeal that have considered the issue.  *See generally Murphy v. FDIC*, 208 F.3d 959, 964 (11th Cir.) (agreeing with Fourth Circuit that *D'Oench* survives, and surveying cases, including from the D.C. and Eighth Circuits, holding to the contrary), *cert. granted sub nom. Murphy v. Beck*, 530 U.S. 1306 (2000), *cert. dismissed*, 531 U.S. 1107 (2001); *FDIC v. Deglau*, 207 F.3d 153, 171 (3d Cir. 2000) ("We agree with the Eighth, Ninth and D.C. Circuits that *D'Oench* is not applicable federal common law in light of *O'Melveny* . . . .").  Nevertheless, because the parties do not suggest that the statutes and *D'Oench* produce differing results, there is no need to explore further the import of *O'Melveny*.

Bank and K Capital." *Id.* at 27.  But, even if *D'Oench, Duhme* or its statutory counterparts apply to this case, the Trustee contends that the Court "should defer a ruling on the applicability of *D'Oench Duhme* until the parties have had an opportunity to conduct discovery," providing the Trustee "with an opportunity to discover what agreements were and were not in the bank's official records."  Opposition at 29.

The scope of the *D'Oench, Duhme* doctrine and its statutory counterparts is not altogether clear.  In some decisions, they are described in terms akin to a statute of frauds, *i.e.*, prohibiting the enforcement of any agreement that does not conform to the requirements of the doctrine. *See, e.g.*, *Nat'l Enters., Inc. v. Barnes*, 201 F.3d 331, 333 n.3 (4th Cir. 2000) ("The *D'Oench* doctrine prohibits claims based upon agreements which are not properly reflected in the official books or records of a failed bank or thrift."); *Young*, *supra*, 103 F.3d at 1187 (stating that *D'Oench, Duhme* "applies in virtually all cases where the FDIC is confronted with an agreement not documented in the institution's records").

In other cases, however, *D'Oench* and § 1823(e) have been described in terms more akin to a parol evidence rule, *i.e.*, prohibiting the use of an agreement that does not conform to the requirements of the doctrine for the purpose of varying or contradicting the terms of another, written agreement.  For instance, in *E.J. Sebastian Associates v. Resolution Trust Corp.*, 43 F.3d 106 (4th Cir. 1994), the Fourth Circuit "question[ed] the applicability of the *D'Oench* Doctrine" in a circumstance where a claim was "based upon an oral agreement" with a failed bank that did not "contradict any prior written contract between the parties."  *Id.* at 109.  The Court said, *id.*:

> Cases applying the *D'Oench* Doctrine traditionally involve a claim based upon an oral side agreement which contradicts a written document.  Typically, *D'Oench* arises to bar a claimant from disputing the enforcement of a written loan agreement based upon an oral agreement that the claimant professes to have entered into with a bank official.  *D'Oench* declared that such oral agreements are

unenforceable; and therefore, the written loan agreement prevails. . . .  [T]his case does not appear to present the traditional *D'Oench* Doctrine scenario.

Similarly, in a subsequent decision in this district, Judge Benson E. Legg stated: "The application of the [*D'Oench*] doctrine necessarily requires a conflict between the alleged side agreement and the written document; if the side agreement comports with the written document, *D'Oench* does not [prevent] its assertion against the banking authority."  *Md. Nat'l Bank v. Resolution Trust Corp.*, 895 F. Supp. 762, 769 (D. Md. 1995) (citing *E.J. Sebastian* and *John v. Resolution Trust Corp.*, 39 F.3d 773 (7th Cir. 1994)).

Based on the conception of *D'Oench* as articulated in *E.J. Sebastian* and *Maryland National Bank*, it may be that *D'Oench* does not apply here.  None of the loans at issue are in the record before me.  But, based on the facts alleged, there would not necessarily be a contradiction between loan agreements with borrowers as described by the Trustee, and a separate agreement between K Bank and K Capital to redistribute *pari passu* any proceeds received by either entity pursuant to such loans.

It is also salient that Count I of the complaint, which asserts a claim of unjust enrichment, does not depend upon an actual agreement between K Bank and K Capital regarding distribution of the loan proceeds.  As the FDIC recognizes, Count I does not contain any express allegation regarding the alleged agreement.

Under Maryland law, a claim of unjust enrichment has three elements: (1) "the plaintiff confers a benefit upon the defendant"; (2) "the defendant knows or appreciates the benefit"; and (3) "the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return."  *Benson v. State*, 389 Md. 615, 651-52, 887 A.2d 525, 546 (2005); *accord Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444,

959 A.2d 793 (2008).   An actual agreement by the defendant to pay the plaintiff is not an element of unjust enrichment; indeed, establishment of an actual agreement between the parties would ordinarily defeat an unjust enrichment claim.   *See, e.g.*, *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) ("In Maryland, a claim of unjust enrichment, which is a quasi-contract claim, [with some exceptions] 'may not be brought where the subject matter of the claim is covered by an express contract between the parties.'").[5]

Writing for the Maryland Court of Special Appeals, Judge Charles E. Moylan, Jr. explained in *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners*, 155 Md. App. 415, 494, 843 A.2d 252, 298 (2004): "A claim of unjust enrichment . . . is not based on contract, even an implied[-in-fact] contract.   It is based on quasi-contract, and a quasi-contract, notwithstanding its name, is not a real contract."   Quoting *Mass Transit Administration v. Granite Construction Co.*, 57 Md. App. 766, 775, 471 A.2d 1121, 1125-26 (1984), Judge Moylan continued:

> "A quasi-contract or *implied in law contract . . . involves no assent between the parties, no* 'meeting of the minds.'   Instead the law implies a promise on the part of the defendant to pay a particular 'debt.'   Thus, '[t]*he implied in law contract is indeed no contract at all*, it is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense.'"

*Alternatives Unlimited*, 155 Md. App. at 480, 843 A.2d at 290 (emphasis in *Alternatives Unlimited*) (internal citations omitted); *accord Mogavero v. Silverstein*, 142 Md. App. 259, 274-76, 790 A.2d 43, 51-53, *cert. denied*, 369 Md. 181, 798 A.2d 553 (2002).   In other words, "[t]o prevent unjust enrichment, the law created a contract, as an unabashed legal fiction."

---

[5] The fact that the Trustee has pleaded the existence of an actual agreement does not undermine his unjust enrichment claim at the motion to dismiss stage, because Fed. R. Civ. P. 8(d)(3) permits pleading in the alternative.   *See, e.g.*, *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002) ("[A]lthough [plaintiff] may not recover under both contract and quasi-contract theories, it is not barred from pleading these theories in the alternative . . . .").

*Alternatives Unlimited*, 155 Md. App. at 472, 843 A.2d at 286.  Therefore, it is by no means clear that *D'Oench, Duhme* and its statutory counterparts have any application to an unjust enrichment claim.  *See FDIC v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1516 (11th Cir. 1984) ("Because Gulf Life's theor[y] of . . . unjust enrichment [is] not . . .based on the parties' mutual assent, section 1823(e) is inapplicable . . . .") (rejecting unjust enrichment claim on other grounds).[6]

The import of 12 U.S.C. § 1821(g)(4), upon which the Trustee relies, is also elusive.  In asserting that § 1821(g)(4) precludes application of *D'Oench* and its statutory counterparts where the FDIC is appointed receiver by a state regulator, the Trustee relies on a single unreported district court decision that reached that conclusion.  *See MVB Mortg. Corp. v. FDIC*, No. 2:08-cv-771, 2009 WL 2047896, at *3 (S.D. Ohio July 9, 2009); *see also id.*, 2009 WL 3259413, at *5 (S.D. Ohio Oct. 6, 2009) (declining to reconsider prior ruling).[7]  The FDIC argues that *MVB* is wrongly decided, and cites a handful of cases (notably including the Supreme Court's only decision applying § 1823(e), *Langley v. FDIC*, *supra*, 484 U.S. 86), in which the *D'Oench* doctrine or its statutory analogs were applied in cases where the FDIC had been appointed

---

[6] In a subsequent decision, *Bufman Organization v. FDIC*, 82 F.3d 1020 (11th Cir. 1996), decided under Florida law, the Eleventh Circuit rejected an unjust enrichment claim on the basis of *D'Oench, Duhme*.  But, it did so without citation to *Gulf Life*, and based on an analysis that did not account for the quasi-contractual nature of unjust enrichment, at least as it is understood in Maryland.  *See id.* at 1028 ("Bufman's unjust enrichment claim is barred by *D'Oench* because it is premised on an unrecorded condition to the repayment of the Bufman note.  Implicit in this claim is the allegation that the bank had an obligation to give Bufman notice . . . .  If the bank agreed to give Bufman such notice, § 1823(e)(1)(D) requires the agreement to be included in the bank's records.").

[7] The Trustee also cites another case that applied state law to resolve a claim against the FDIC as receiver under 12 U.S.C. § 1821(g)(4), but that case did not involve the *D'Oench* doctrine or §§ 1821(d)(9)(A) or 1823(e).  *See Stebbins Realty Corp. v. FDIC*, Civ. No. 91-568-JD, 1994 WL 312916, at *1 (D.N.H. June 29, 1994).

- 12 -

receiver by a state regulator.[8] However, none of the cases cited by the FDIC mentioned or addressed the impact of § 1821(g)(4) on a *D'Oench, Duhme* claim. Indeed, to my knowledge, the *MVB* Court is the only one that has squarely decided whether § 1821(g)(4) precludes *D'Oench*, and that court held that it does. Perhaps *MVB* is an outlier. But, at this juncture, there is no need to reach a definitive resolution of the thorny issues concerning the extent to which *D'Oench* applies or the effect of § 1821(g)(4); I agree with the Trustee that resolution of these issues at the motion to dismiss stage is premature.

The FDIC argues that "unless all requirements of § 1823(e) are pled with respect to an alleged 'agreement,' no cause of action is stated and no relief can be granted." Motion at 9. It contends that a plaintiff must plead satisfaction of *D'Oench* or its statutory counterparts in the plaintiff's complaint, *id.* and relies for this proposition upon the Fourth Circuit's decisions in *Young* and *Allen*. These cases are inapt. To be sure, the *Young* Court iterated that a "plaintiff must satisfy all four requirements [of § 1823(e)] before it can enforce an agreement against the FDIC." *Young*, 103 F.3d at 1187. Similarly, the *Allen* Court said: "All four [statutory] requirements must be satisfied for an agreement to be enforceable against [the receiver]." *Allen*, 16 F.3d at 574. But, neither *Young* nor *Allen* held that satisfaction of the statutory requirements must be pleaded in a complaint in order to survive a Rule 12(b)(6) motion; *Young* was decided on review of a grant of summary judgment, *see* 103 F.3d at 1186, and *Allen* on appeal from a directed verdict after trial on the merits. *See* 16 F.3d at 572. Indeed, the Court's research has uncovered no Fourth Circuit case in which a *D'Oench, Duhme* defense was resolved on a Rule 12(b)(6) motion.

---

[8] In addition to *Langley*, the FDIC cites *Bufman Organization v. FDIC*, 82 F.3d 1020 (11th Cir. 1996), and *FDIC v. 32 Edwardsville, Inc.*, 873 F. Supp. 1474 (D. Kan. 1995). The FDIC also cites *D'Oench*, which preceded the enactment of § 1821(g)(4).

As noted, motions practice under Rule 12(b)(6) typically cannot determine the applicability of defenses, unless the facts supporting the defense are pleaded in the complaint. *See Goodman*, *supra*, 494 F.3d at 464. Here, the Trustee's complaint does not specifically allege that the agreement between K Bank and K Capital was unwritten, nor does the complaint contain any express allegation that is inconsistent with the other requirements of 12 U.S.C. § 1823(e). Even if *D'Oench* and § 1823(e) are applicable, discovery may reveal that the alleged agreement is memorialized in a writing in K Bank's records that satisfies the statutory requirements. To be sure, the FDIC argues that it is "inherently implausible" that "such an agreement would actually be in writing." Motion at 14 n.6. Although it may be unlikely that a written agreement will be produced, I do not view it as so unlikely as to be implausible as a matter of law, under the *Iqbal* and *Twombly* standard.

Stated another way, no facts concerning the alleged agreement between K Bank and K Capital (aside from its alleged existence) are presently before the Court, nor are any of the loan agreements between either entity and the borrowers. Development of a factual record will illuminate the issues and provide a sound platform from which to analyze the legal issues raised by the FDIC regarding *D'Oench, Duhme* and 12 U.S.C. § 1823(e).

Accordingly, I will deny the Motion to the extent it is premised on *D'Oench, Duhme* and its statutory counterparts, without prejudice to the FDIC's right to reassert its *D'Oench* defense at the summary judgment stage.

### C. FIRREA's "Anti-Injunction" Provision: 12 U.S.C. § 1821(j)

The FDIC also argues that the Trustee's claims are barred by another provision of FIRREA, the so-called "anti-injunction" statute: 12 U.S.C. § 1821(j). Section 1821(j) provides, with exceptions not applicable here: "Except as provided in [§ 1821], no court may take any

action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver." According to the FDIC, § 1821(j) is a bar to any equitable remedy against it in its capacity as receiver. *See* Motion at 30-32.

In response, the Trustee makes two arguments. First, the Trustee points out that, in his claims for unjust enrichment and promissory estoppel (Counts I & II), he seeks only an award of money damages. According to the Trustee, money damages claims are not barred by § 1821(j) because they are legal, not equitable, and because claims for money damages are otherwise provided for in § 1821. Second, the Trustee contends that § 1821(j) bars only injunctions, and not other forms of equitable relief that do not "restrain or affect the exercise" of the FDIC's powers. *See* Opposition at 13-20.

The Trustee is correct that, under Maryland law, unjust enrichment and promissory estoppel claims for money damages are claims at law, rather than claims in equity. *See Ver Brycke v. Ver Brycke*, 379 Md. 669, 698, 843 A.2d 758, 775 (2004) (holding that plaintiffs' unjust enrichment and promissory estoppel claims "were claims at law because they were claims seeking the remedy of restitution for money"). Nevertheless, both doctrines have an equitable basis. As noted, the third element of an unjust enrichment claim is that "the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson*, 389 Md. at 651-52, 887 A.2d at 546.

The elements of a promissory estoppel claim in Maryland were established in the touchstone case of *Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 166, 674 A.2d 521, 533 (1996):

1. a clear and definite promise;

2.  where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

3.  which does induce actual and reasonable action or forbearance by the promisee; and

4.  causes a detriment which can only be avoided by the enforcement of the promise.

The *Pavel* Court made clear the equitable considerations that underpin the fourth element, *id.* at 168, 674 A.2d at 533-34:

> [T]he trial court, and not a jury, must determine that binding the subcontractor is necessary to prevent injustice.  This element is to be enforced as required by common law equity courts—the general contractor must have "clean hands." This requirement includes . . . the further determination that justice compels the result.

Despite the equitable foundations of both doctrines, it does not follow that any relief awarded pursuant to an unjust enrichment or promissory estoppel claim will be equitable in nature.  Of course, "[i]n the broadest sense, almost every legal principle is based on its being 'equitable' in the sense that the law, whenever it reasonably can, seeks a result that is fair and just." *Alternatives Unlimited*, 155 Md. App. at 457-58, 843 A.2d at 277.  But, as this Court explained in *Sedghi v. Patchlink Corp.*, 823 F. Supp. 2d 298 (D. Md. 2011):

> "[O]verwhelmingly, courts characterize claims according to the remedies sought rather than according to subject matter or substantive rules involved.  If the remedy sought is a coercive order, the claim is equitable; if the remedy sought is a judgment to be enforced in rem by seizure of property, the claim is legal.  An action for ordinary money judgment, for replevin, or for ejectment is an action at law.  In contrast, a suit for injunction or one for specific performance is equitable."

*Id.* at 305 (quoting 1 DAN B. DOBBS, LAW OF REMEDIES at 156-57 (2d ed. 1993) ("DOBBS")); *accord Ver Brycke*, 379 Md. at 773, 843 A.2d at 773 ("[R]emedies sought serve to delineate the type of action, whether it be in law or equity.").

As to unjust enrichment, relief "in the form of a money judgment for unjust enrichment based on quasi-contract is . . . clearly a remedy at law." *Alternatives Unlimited*, 155 Md. App. at

462, 843 A.2d at 279-80; *see also Bennett Heating & Air Conditioning, Inc. v. NationsBank of Md.*, 342 Md. 169, 180, 674 A.2d 534, 539 (1996) ("Restitution claims for money are usually claims 'at law.'") (citation and internal quotation marks omitted).   Conversely, "a restitutionary remedy [for unjust enrichment] that is coercive in nature and *in personam* in focus is an equitable remedy." *Alternatives Unlimited*, 155 Md. App. at 462, 843 A.2d at 280.

As with unjust enrichment, a promissory estoppel claim for money damages sounds in law, not equity.   "[I]n Maryland, promissory estoppel is an alternative means of obtaining contractual relief." *Md. Transp. Auth. Police Lodge No. 34 of Fraternal Order of Police v. Md. Transp. Auth.*, 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010), *rev'd in part on other grounds*, 420 Md. 141, 21 A.3d 1098 (2011); *see also Pavel Enters.*, 342 Md. at 169, 674 A.2d at 534 ("[T]here are different ways to prove that a contractual relationship exists . . . .   Traditional bilateral contract theory is one.   Detrimental reliance [a.k.a. promissory estoppel] can be another."); *Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992) (applying Maryland law, and stating that "the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract").   To the extent that a promissory estoppel claim seeks money damages, such damages "'are, of course, the classic form of *legal* relief.'" *Sedghi*, 823 F. Supp. 2d at 305 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)) (emphasis in *Mertens*) (holding that plaintiff seeking money damages via Maryland promissory estoppel claim sought legal, rather than equitable, relief and therefore was entitled to trial by jury); *accord Ver Brycke*, 379 Md. at 698, 843 A.2d at 775.

A monetary award is the only relief requested by the Trustee in counts I and II. Therefore, these counts, by their own terms, do not seek equitable relief and do not appear to be

subject to the bar of 12 U.S.C. § 1821(j).[9]

Nevertheless, the FDIC argues that, although these counts "ostensibly seek money damages," they "by necessity, seek reformation of the separate loans into 'Joint Loans.'"  Motion at 32.  Contending that contract reformation is an equitable remedy, the FDIC cites *Flester v. Ohio Cas. Ins. Co.*, 269 Md. 544, 556, 307 A.2d 663, 669 (1973), in which the Maryland Court of Appeals stated that "courts exercising equity powers may reform an instrument to conform it to the intention of the parties."  As the FDIC sees it, counts I and II must be dismissed, not only pursuant to 12 U.S.C. § 1821(j), but also because the complaint fails to plead the elements of a cause of action for contract reformation, and because the Trustee failed to include necessary parties, specifically the borrowers who executed the various loans with K Capital and K Bank.

The gist of the FDIC's argument regarding contract reformation is that recognition of the Trustee's "joint loan" theory would require the modification of all of the loans, including "changes in the priority of liens, the allocation of payment priority, and/or the outstanding loan amounts."  Motion at 26.  The Trustee responds that this argument is a "classic 'straw man.'"  Opposition at 20.

The Trustee has not sought contract reformation, and so it is neither surprising nor dispositive that his complaint does not state a claim for reformation.  And, I am not convinced

---

[9] In an action such as this, filed under 12 U.S.C. § 1821(d)(6) against the FDIC as receiver of a failed bank, the FDIC is permitted to satisfy monetary damages claims by issuance of receivership certificates.  *See, e.g.*, *Battista v. FDIC*, 195 F.3d 1113, 1116 (9th Cir. 1999) ("There is no question that the FDIC may pay creditors with receiver's certificates instead of with cash."); *Adagio Inv. Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71, 74 n.4 (D.D.C. 2004); *Franklin Bank v. FDIC*, 850 F. Supp. 845, 847-49 (N.D. Cal. 1994).  A claimant whose claim is satisfied by issuance of a certificate may ultimately receive monetary payments from the FDIC, potentially up to the amount of the certificate, as and to the extent that the assets of the bank are distributed by the receiver according to a statutory system of priority established by 12 U.S.C. § 1821(d)(11)(A).  Nevertheless, this does not defeat the legal viability of a claim for money damages against the FDIC as receiver, nor does the FDIC so argue.  "Courts uniformly have held that the preclusion of section 1821(j) does not affect a damages claim."  *Hindes v. FDIC*, 137 F.3d 148, 161 (3d Cir. 1998).

that the relief the Trustee seeks is contract reformation in other clothing.  It is by no means obvious that the terms of the loans executed by the borrowers and K Capital and K Bank would be altered in any way by a separate agreement between K Bank and K Capital (or a restitutionary remedy having the same effect as such an agreement) to split between the two entities *pari passu* the loan proceeds recovered from the borrowers.  At the very least, it would be impossible for the Court to determine that reformation would be necessary at the pleading stage, when none of the loan instruments is in the record before me.

I agree with the FDIC, however, that the Trustee's claims for a declaratory judgment (Count III) and a constructive trust (Count IV) are barred by 12 U.S.C. § 1821(j). Notwithstanding the Trustee's argument to the contrary, courts routinely interpret § 1821(j) to provide, with very few exceptions, that "no court may grant equitable relief against the FDIC except as provided by FIRREA."  *Henrichs v. Valley View Development*, 474 F.3d 609, 614 (9th Cir. 2007); *see also Sharpe v. FDIC*, 126 F.3d 1147, 1154 (9th Cir. 1997) ("Section 1821(j) prevents courts from granting any equitable relief against the FDIC."); *Hanson v. FDIC*, 113 F.3d 866, 871 (8th Cir. 1997) ("Section 1821(j) . . . 'effect[s] a sweeping ouster of courts' power to grant equitable remedies . . . .'") (quoting *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C.Cir. 1995)); *Tri-State Hotels, Inc. v. FDIC*, 79 F.3d 707, 715 (8th Cir. 1996) (also quoting *Freeman*). *But see Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 923 (4th Cir. 1996) (holding that § 1821(j) does not bar an injunction prohibiting a federal receiver from violating the Constitution, because "enjoining the [receiver] from doing so cannot infringe on its statutorily granted powers"); *James Madison, Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1093 (D.C. Cir. 1996) ("We . . . read section 1821(j) to prevent courts from interfering with the FDIC

only when the agency acts within the scope of its authorized powers, not when the agency was improperly appointed in the first place.").

"Under certain circumstances, declaratory relief has been deemed 'functionally equivalent' to injunctive relief." *Alli v. Decker*, 650 F.3d 1007, 1014 (3d Cir. 2011) (citing *California v. Grace Brethren Church*, 457 U.S. 393 (1982) (holding that the Tax Injunction Act prohibits declaratory as well as injunctive relief)). Where a claimant seeks "a declaratory judgment that would effectively 'restrain' the FDIC" in the exercise of its powers, in the same manner that an injunction would, courts have held that "§ 1821(j) deprives the court of power to grant that remedy as well." *Freeman*, *supra*, 56 F.3d at 1399; *accord Courtney v. Halleran*, 485 F.3d 942, 948 (7th Cir. 2007); *Tri-State Hotels*, *supra*, 79 F.3d at 715. Here, the Trustee seeks a declaration that "K Capital is entitled to receive its share, on a *pari passu* basis, of past, *current, and future* proceeds of payments on the Joint Loans and/or collateral . . . ." Complaint at 7 (emphasis added). Such a declaration would affect the FDIC's exercise of its powers in virtually the same manner as an injunction directing the FDIC to make future payments. Accordingly, it is the functional equivalent of an injunction and is barred by § 1821(j).

The same is true of the Trustee's claim for a constructive trust. As the FDIC points out, although the Trustee pleaded constructive trust as a separate "count," a constructive trust is "a type of equitable remedy, and not a cause of action." *Stewart Title Guar. Co. v. Sanford Title Servs., LLC*, Civ. No. ELH-11-260, 2011 WL 2681196, at *4 (D. Md. July 8, 2011); *accord Lyon v. Campbell*, 33 F. App'x 659, 663 (4th Cir. 2002) (applying Maryland law and stating: "A constructive trust is an equitable remedy, not a cause of action in and of itself."). In *Washington Suburban Sanitary Commission v. Utilities, Inc.*, 365 Md. 1, 39, 775 A.2d 1178, 1200 (2001) (citation omitted), the Maryland Court of Appeals explained that the "'constructive trust, like its

counterpart remedies "at law," is a remedy for unjust enrichment.'"   In other words, a constructive trust is a "remedial request[] that depend[s] upon [the] plaintiff's substantive causes of action," such as unjust enrichment.   *Stewart Title*, 2011 WL 2681196, at *5; *see also Alternatives Unlimited*, 155 Md. App. at 460, 843 A.2d at 279.

A constructive trust "is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property."  *Wimmer v. Wimmer*, 287 Md. 663, 668, 414 A.2d 1254 (1980).  "[T]he constructive trust plaintiff who proves his claim . . . wins an *in personam* order that requires the defendant to transfer legal rights and title of specific property or intangibles to the plaintiff." 1 DOBBS, § 4.3(2), at 590–91; *see also De Arriz v. Klingler-De Arriz*, 179 Md. App. 458, 480, 947 A.2d 59, 71 ("'Equity declares the [constructive] trust in order that it may lay its hand on the thing and wrest it from the possession of the wrongdoer.'") (citation omitted), *cert. denied*, 405 Md. 349, 952 A.2d 225 (2008).  The imposition of a constructive trust would have sweeping effects on the FDIC's exercise of its powers, akin to an injunction.  "By imposing a constructive trust" on property held by a failed bank in receivership, a "district court would . . . make [the plaintiff] the beneficial owner of that property."  *Hanson*, *supra*, 113 F.3d at 871. Thus, "[i]mposition of a constructive trust would necessarily 'restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver.'"  *Id.* (quoting 12 U.S.C. § 1821(j)); *accord Hindes*, *supra*, 137 F.3d at 159.  Therefore, Counts III and IV of the Trustee's complaint will be dismissed.

The FDIC also argues that the Trustee's claim for an accounting (Count V) should meet the same fate, but this is not so clear.  To be sure, an accounting is considered an equitable remedy.  *See Mass Transit Admin.*, *supra*, 57 Md. App. at 774, 471 A.2d at 1125 ("*In equity*, the

principal restitutionary remedies are the constructive trust, the equitable lien, subrogation, *and the accounting for profits*.") (emphasis added).   However, the FDIC has cited no cases holding that an accounting is the type of equitable remedy that would "restrain or affect the exercise of powers or functions" of the FDIC, within the meaning of § 1821(j).   Indeed, the only reported federal opinion that appears to have addressed this question is *Heno v. FDIC*, 996 F.2d 429, 432 n.6 (1st Cir. 1993), *withdrawn and substituted on reh'g on other grounds by* 20 F.3d 1204 (1st Cir. 1994), cited by the Trustee, in which the First Circuit stated: "[W]e note, without deciding, that § 1821(j)'s express language does not appear to bar *non*injunctive equitable relief against the FDIC, such as the accounting Heno seeks . . . ."  (Emphasis in original.)[10]

The FDIC argues that another provision of FIRREA, 12 U.S.C. § 1821(d)(15), establishes the FDIC's responsibilities to provide an accounting for a receivership.[11]   According to the

--------

[10]   Because the original panel opinion in *Heno* was withdrawn, it no longer has precedential force.   The substituted opinion does not contain any discussion regarding the viability of claims for accounting against the FDIC as receiver.   In any event, even if the original panel opinion had not been withdrawn, its comment regarding accounting claims was stated in a footnote and expressly labeled as *dictum*.   Nevertheless, I do not fault the Trustee for citing the *Heno* decision because, as noted, it appears to be the only federal decision that has commented to any significant extent on the effect of § 1821(j) on an accounting claim.

[11]   Section 1821(d)(15) states, in part:

(A) In general

The [FDIC] as conservator or receiver shall, consistent with the accounting and reporting practices and procedures established by the [FDIC], maintain a full accounting of each conservatorship and receivership or other disposition of institutions in default.

(B) Annual accounting or report

With respect to each conservatorship or receivership to which the [FDIC] was appointed, the [FDIC] shall make an annual accounting or report, as appropriate, available to the Secretary of the Treasury, the Comptroller General of the United States, and the authority which appointed the [FDIC] as conservator or receiver.

*(cont'd...)*

FDIC, "plaintiff has no private right to compel any additional accounting." Reply at 23. For this proposition, the FDIC cites *Hindes*, *supra*, 137 F.3d at 171, in which the Third Circuit held that shareholders of a failed bank had no private right of action to compel the FDIC to comply with the accounting requirement of § 1821(d)(15). Notably, however, a member of the *Hindes* panel dissented on this point, *see id.* at 172-73 (Roth, J., concurring and dissenting), and the Ninth Circuit expressly disagreed with the *Hindes* Court's conclusion. *See First Pacific Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1127 (9th Cir. 2000) (finding private right of action under § 1821(d)(15) and acknowledging conflict with *Hindes*); *see also Courtney*, *supra*, 485 F.3d at 947-48 (noting conflict between *Hindes* and *First Pacific*, and concluding that whether private right of action existed under § 1821(d) "is sufficiently complex . . . that it should not be handled as . . . at most . . . an alternative ground for decision"). More important, neither *Hindes* nor any of the other cases just cited considered the viability of a common law claim for an accounting, based on an obligation of the failed institution in receivership arising from its pre-receivership conduct, rather than the FDIC's own obligations as receiver. In sum, I have found no authority for the proposition that § 1821(d)(15) precludes a claim based on another source of entitlement for accounting against the FDIC as receiver.

The FDIC also argues that Maryland law does not recognize a freestanding claim for an accounting, but rather treats accounting only as a remedy. Although assertion of an independent cause of action for accounting is no longer necessary in most cases, it has not been entirely abolished in Maryland.

---

(C) Availability of reports

Any report prepared pursuant to subparagraph (B) shall be made available by the [FDIC] upon request to any shareholder of the depository institution for which the [FDIC] was appointed conservator or receiver or any other member of the public.

In the recent case of *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 36 A.3d 399 (2012), decided after the FDIC's Motion was briefed, the Maryland Court of Appeals stated: "In Maryland, a claim for an accounting is available when 'one party is under [an] obligation to pay money to another based on facts and records that are known and kept exclusively by the party to whom the obligation is owed, or where there is a [confidential or] fiduciary relationship between the parties . . . .'" *Id.* at 365, 36 A.2d at 418 (quoting *P.V. Props., Inc. v. Rock Creek Village Assocs. Ltd. P'ship*, 77 Md. App. 77, 89, 549 A.2d 403, 409 (1988)) (alteration to restore accurate quotation of *P.V. Properties*); *see also Ahmad v. Eastpines Terrace Apts., Inc.*, 200 Md. App. 362, 378, 28 A.3d 1, 10, *cert. denied*, 424 Md. 55, 33 A.3d 982 (2011).

As the Maryland Court of Special Appeals recognized in *Alternatives Unlimited*, 155 Md. App. at 510, 843 A.2d at 307-08, "whereas an equitable claim for an accounting once served a necessary discovery function, that function has been superseded by modern rules of discovery" in the ordinary run of cases.[12]  "Because the relief sought in an accounting claim is access to

---

[12] Based in part on this statement in *Alternatives Unlimited*, some recent decisions in this district, beginning with *IFAST, Ltd. v. Alliance for Telecommc'ns Indus. Sols., Inc.*, Civ. No. CCB-06-2088, 2007 WL 3224582, at *11 (D. Md. Sept. 27, 2007), have stated that an accounting is only a remedy and is not an independent cause of action under Maryland law. *See, e.g.*, *West v. Koehler*, Civ. No. RDB-11-3051, 2012 WL 868657, at *7 (D. Md. Mar. 13, 2012); *Johnson v. Prosperity Mortg. Corp.*, Civ. No. AW-11-2532, 2011 WL 5513231, at *5 (D. Md. Nov. 3, 2011); *Makowski v. Bovis Lend Lease, Inc.*, Civ. No. RDB-10-1844, 2011 WL 1045635, at *11 (D. Md. Mar. 17, 2011); *Solid Concepts, LLC v. Fallen Soldiers, Inc.*, Civ. No. DKC-09-2377, 2010 WL 3123269, at *5 (D. Md. Aug. 9, 2010); *Orteck Int'l, Inc. v. Transpacific Tire Wheel, Inc.*, 704 F. Supp. 2d 499, 521 (D. Md. 2010). *But see Gephardt v. Mortg. Consultants, Inc.*, Civ. No. JFM-10-1537, 2011 WL 531976, at *4-5 (D. Md. Feb. 8, 2011) (recognizing availability of accounting as a cause of action where confidential or fiduciary relationship is present). In PAUL MARK SANDLER & JAMES K. ARCHIBALD, PLEADING CAUSES OF ACTION IN MARYLAND (4th ed. 2008, 2010 Supp.), the authors noted that, before the decision in *IFAST*, they had "assumed that an accounting was a[n] independent cause of action, rather than simply a remedy," and suggested that it "remains to be seen" how the *IFAST* Court's assertion would "be viewed by the Maryland appellate courts . . . ."

In my view, the Maryland Court of Appeals's recent reiteration in *Polek* of the principles of liability for accounting indicates that, in some circumstances, an accounting may serve as an

information, discovery is the remedy given to plaintiffs who prove they are entitled to an accounting." *Golub ex rel. Golub v. Cohen*, 138 Md. App. 508, 523, 772 A.2d 880, 889 (2001). In short, when a plaintiff properly pleads another cause of action that will entitle the plaintiff to discovery, the remedy of accounting is generally superfluous.

*P.V. Properties* provides an example under Maryland law of when a freestanding claim for accounting is appropriate. In that case, a commercial tenant in a shopping center sought "an itemized listing of common area maintenance expenses where the lease [was] silent in that respect and the landlord [was] unwilling to provide the desired information." 77 Md. App. at 80, 549 A.2d at 404. The Maryland Court of Special Appeals explained the "general rule" that "a suit in equity for an accounting may be maintained when the remedies at law are inadequate," and said: "An accounting may be had . . . where there is a confidential or fiduciary relation between the parties, and a duty rests upon the defendant to render an account." *Id.* at 89, 549 A.2d at 409 (citing, *inter alia*, *Nagel v. Todd*, 185 Md. 512, 45 A.2d 326 (1946)).

According to the *P.V. Properties* Court, there was a "limited fiduciary relationship" between the landlord and tenant, because the landlord "maintain[ed] and exclusively control[led] the records which document its expenses," and the tenant was "forced to rely on the good faith and fair dealing of the landlord in assessing the charges." *Id.* at 91, 549 A.2d at 410. In that circumstance, the court rejected the landlord's assertion that the tenant had an adequate remedy at law, stating, *id.* at 91-92, 549 A.2d at 410:

> [Landlord] assert[s] that [tenant] could sue . . . for breach of contract and then through the civil discovery procedures obtain from [landlord] an itemized accounting. This suggestion is ludicrous, and certainly not one that leads to an adequate remedy at law. What [landlord is] suggesting is a reversal of proper litigation procedures. Generally, a claimant has a cause of action against a defendant that the parties have not been able to resolve, and therefore the claimant files suit. In its proposed scenario, [landlord] recommends that [tenant] first

independent cause of action.

institute legal proceedings and then determine through discovery whether or not it has a cause of action.  This course of action is a waste of both the court's and the litigants' time and expense.  In addition, should [tenant] refuse to tender payment, [it runs] the risk of being sued for breach of contract and further, run[s] the risk of being evicted from the shopping center.  This can hardly be considered an adequate remedy at law.

In contrast, accounting claims have been rejected where the "plaintiff was fully capable of ascertaining, through its own efforts, the information it sought from the defendant by way of an accounting," *Alternatives Unlimited*, 155 Md. App. at 510, 843 A.2d at 307, where "discovery was otherwise available," *id.* at  511, 843 A.2d at 308 (citing cases), or where "there was no basis for inferring that [defendant] was in any sort of confidential relationship with or bore any fiduciary duty toward [plaintiff]."  *Id.* at 508, 843 A.2d at 306.

Here, the Trustee alleges that K Bank was the servicer of the loans extended to borrowers by K Capital.  *See* Complaint ¶ 16.  He also contends, on information and belief, that K Bank "retained the full proceeds of payments on the Joint Loans and/or collateral" securing the loans. *Id.* ¶ 43.  Moreover, according to the complaint, the "FDIC, as receiver of K Bank, refuses to allow K Capital to inspect its account books, records, and documents so that it may determine the full extent of the proceeds of payments on the Joint Loans and/or collateral." *Id.* ¶ 44.[13]

In my view, these allegations are sufficient to state a claim for accounting.[14] Accordingly, I decline to dismiss Count V.[15]

---

[13] With his Opposition, the Trustee has submitted a declaration detailing his attempts to obtain K Capital's records from the FDIC.  *See* Declaration of Charles R. Goldstein, Ex.A to Opposition (ECF 14-1).  The FDIC argues that I cannot consider Mr. Goldstein's declaration in resolving the FDIC's Rule 12(b)(6) Motion, because the declaration constitutes matter outside of the pleadings.  *See* Reply at 12 n.8.  In light of the allegations of the complaint, quoted above, I need not rely on the additional facts alleged in the declaration to make my ruling, and so it is unnecessary to resolve whether the Court can consider the declaration under Rule 12(b)(6).

[14] Indeed, the Trustee would appear to have a basis for an accounting claim due to K Bank's role as servicer of K Capital's loans and the FDIC's alleged refusal, as receiver, to provide the Trustee with documentation regarding those loans, independent of the Trustee's

### D.  Unclean Hands and *In Pari Delicto*

The FDIC also contends that the Trustee's claims are barred by the equitable doctrines of unclean hands and *in pari delicto*.  The Maryland Court of Appeals recapitulated the unclean hands doctrine in *Dickerson v. Longoria*, 414 Md. 419, 995 A.2d 721 (2010):

> "The [un]clean hands doctrine states that 'courts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he seeks assistance.'  *Hlista* [*v. Altevogt*], 239 Md. [43,] 48, 210 A.2d [153,] 156 [(1965)]; *see also Hicks v. Gilbert*, 135 Md. App. 394, 400, 762 A.2d 986, 989-90 (2000).  The doctrine does not mandate that those seeking equitable relief must have exhibited unblemished conduct in every transaction to which they have ever been a party, but rather that the particular matter for which a litigant seeks equitable relief must not be marred by any fraudulent, illegal, or inequitable conduct.  *Hlista*, 239 Md. at 48, 210 A.2d at 156; *Hicks*, 135 Md. App. at 400-01, 762 A.2d at 990 ('There must be a nexus between the misconduct and the transaction, because "[w]hat is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts."') (quoting *Adams v. Manown*, 328 Md. 463, 476, 615 A.2d 611, 617 (1992))."

*Id.* at 455, 955 A.2d at 743 (quoting *Wells Fargo v. Neal*, 398 Md. 705, 729-30, 922 A.2d 538, 552-53 (2007)) (alterations in *Dickerson*).

The related doctrine of *in pari delicto* is a general rule (subject to exceptions) that, "'[w]hen plaintiff and defendant have participated in fraudulent or illegal conduct, contrary to law or public policy or in fraud of the law itself, and are *in pari delicto*, plaintiff cannot maintain suit—at law or in equity—directly arising out of the misconduct.'"  *Adams v. Manown*, 328 Md.

---

claims that K Capital's loans should be treated as joint loans with  K Bank's loans on a *pari passu* basis.

[15]  In *Golub*, *supra*, 138 Md. App. at 519-24, 772 A.2d at 887-90, the intermediate Maryland appellate court recognized that, because "discovery is the remedy given to plaintiffs who prove they are entitled to an accounting," some bifurcation of discovery may be appropriate in a suit seeking accounting: "'the first stage concerns whether there is any right to an accounting, and only if it is determined that there is such a right does the proceeding move on to the second stage, which comprises the actual accounting.'"  *Id.* at 520, 772 A.2d at 887 (citation omitted).  It reasoned: "'[W]ithout the rule, any person could inspect the private records of another by the simple device of filing a complaint against the latter asking for an accounting.'"  *Id.* (citation omitted).

463, 487, 615 A.2d 611, 623 (1992) (Chasanow, J., concurring and dissenting) (quoting *Messick v. Smith*, 193 Md. 659, 669, 69 A.2d 478, 481 (1949)); *see also Hartford Acc. & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 277, 674 A.2d 106, 135 (1996), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).  Its name derives from the Latin maxim, "*in pari delicto potior est conditio defendentis*," which means that, in cases of equal fault, the defendant has the better position, or in other words, "where fault is mutual, the law will leave the case as it finds it."  *Schneider v. Schneider*, 335 Md. 500, 508, 644 A.2d 510, 514 (1994).

Of course, the FDIC does not contend that the Trustee personally is guilty of inequitable conduct.  Rather, the FDIC argues that the Trustee stands in the shoes of K Capital, and that K Capital's complicity in the alleged loan scheme defeats the Trustee's claims (on behalf of K Capital) against K Bank (via the receiver) for unjust enrichment.  *See* Motion at 22-25.  In response, the Trustee argues that his responsibility is to maximize the value of the K Capital estate for the benefit of K Capital's creditors, and that, "absent any indication that the *creditors* were substantially involved in the alleged wrongdoing," *in pari delicto* and unclean hands should not apply.  Opposition at 24 (emphasis in original).

There is precedent from several other circuits that supports the legal position advanced by the FDIC, *i.e.*, that a defense of *in pari delicto* may be asserted against a trustee in bankruptcy on the basis of the debtor's complicity in the alleged inequitable or illegal conduct of the defendant.  *See, e.g.*, *Mosier v. Callister, Nebeker & McCullogh*, 546 F.3d 1271, 1276 (10th Cir. 2008) ("[I]t is well established that *in pari delicto* may bar an action by a bankruptcy trustee against third parties who participated in or facilitated wrongful conduct of the debtor.") (citing cases); *Nisselson v. Lernout*, 469 F.3d 143, 153 (1st Cir. 2006) (stating that "the in pari delicto defense must be available to a defendant in an action by a bankruptcy trustee whenever that defense

would have been available in an action by the debtor," and that, "[a]s a necessary corollary of that proposition, there is no 'innocent successor' exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an in pari delicto defense against the debtor"); *Off. Cmte. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006) ("If a claim of [the debtor] would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense."); *Grassmueck v. Amer. Shorthorn Ass'n*, 402 F.3d 833, 836 (8th Cir. 2005) ("[T]he equitable defense of *in pari delicto* is available in an action by a bankruptcy trustee against another party if the defense could have been raised against the debtor."); *Off. Cmte. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 355-60 (3d Cir. 2001) ("[T]he *in pari delicto* doctrine bars the Committee, standing in the shoes of the Debtors, from bringing its claims against [defendant]."); *see also Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 967-68 (5th Cir. 2012) (citing cases applying *in pari delicto* to bankruptcy trustees, but distinguishing them on the basis that the case at bar concerned application of *in pari delicto* to a receiver).

However, the courts of appeal are not unanimous. The Second Circuit has espoused the view that *in pari delicto* does not apply to claims brought by a trustee, stating that "[t]he trustee in bankruptcy stands not only in the shoes of the bankrupt[;] he fits as well into the overshoes of the bankrupt's creditors," and that "[p]ermitting [the creditors] to recover does not involve the Court in a dispute between scoundrels but rather extends aid to innocent creditors, in furtherance of the aims of the Bankruptcy Act." *In re Leasing Consultants, Inc.*, 592 F.2d 103, 110-11 (2d Cir. 1979). Other courts, while affirming the general viability of the defense against trustees, have applied exceptions to the doctrine. *See, e.g.*, *In re Lexington Home for the Aged*, 659 F.3d

282, 292-93 (3d Cir. 2011) (stating that, "[w]ith respect to *in pari delicto* in a bankruptcy context, 'the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor,'" but applying "an exception to the applicability of *in pari delicto*, when the complained-of action did not actually benefit the corporation"). And, not all of the circuits have resolved the issue. *See, e.g.*, *Parmalat Capital Finance Ltd. v. Bank of America Corp.*, 671 F.3d 261, 267 (7th Cir. 2012) ("'[T]here is no controlling authority in the Seventh Circuit or Illinois on whether the defense of in pari delicto is available against a bankruptcy trustee.'") (citation omitted).

Moreover, commentators have suggested that application of the *in pari delicto* defense to bankruptcy trustees is inappropriate. *See, e.g.*, Jeffrey Davis, *Ending the Nonsense: The In Pari Delicto Doctrine Has Nothing to Do With What is § 541 Property of the Bankruptcy Estate*, 21 EMORY BANKR. DEV. J. 519 (2005); Risa Lynn Wolf-Smith, *Innocent Trustee/Creditors Barred by Debtors' Past Wrongs: It Just Ain't Right*, 26 Am. Bankr. Inst. J., No. 2, at 42 (Apr. 2007); William McGrane, *The Erroneous Application of the Defense of In Pari Delicto to Bankruptcy Trustees*, 29 CAL. BANKR. J. 275 (2007); Gerald L. Baldwin, *in pari delicto Should Not Bar a Trustee's Recovery*, 23 AM. BANKR. INST. J. 8 (Oct. 2004); Tanvir Alam, *Fraudulent Advisors Exploit Confusion in the Bankruptcy Code: How in pari delicto Has Been Perverted to Prevent Recovery for Innocent Creditors*, 77 AM. BANKR. L.J. 305 (Summer 2003).

To the extent that the Fourth Circuit has addressed the issue, it does not appear to have endorsed the use of the *in pari delicto* defense against a bankruptcy trustee. In *In re Bogdan*, 414 F.3d 507 (4th Cir. 2005), the Court rejected the application of *in pari delicto* to a bankruptcy trustee who, on behalf of several mortgage lenders who were creditors of the debtor, brought an

adversary proceeding against the debtor's co-conspirators in an alleged mortgage fraud scheme. In reversing as legally erroneous application of *in pari delicto* by both the bankruptcy and district courts, *see id.* at 515 n.3, the Fourth Circuit said that the doctrine of *in pari delicto* had "no application in this adversary proceeding because the trustee is suing on behalf of the estate as assignee of the mortgage lenders." *Id.* at 514.  As such, the Court reasoned, "the trustee stands in the shoes of the mortgage lenders, thereby . . . becoming subject to all defenses that could have been asserted against the mortgage lenders, not [the debtor]." *Id.*[16]

The Maryland Court of Appeals also has expressed hostility to the view that a debtor's inequitable conduct should bar a bankruptcy trustee's claims based on the doctrine of *in pari delicto*.  In *Adams v. Manown*, *supra*, 328 Md. 463, 615 A.2d 611 (1992), the Maryland court considered a lawsuit brought by a "discharged bankrupt," who sought "the repayment of numerous alleged loans, none of which were scheduled by the [debtor] as assets of the bankruptcy estate." *Id.* at 465, 615 A.2d at 612.  The defendant asserted that the claims were barred by unclean hands and *in pari delicto*, due to the debtor's concealment of the debts in his bankruptcy, but the debtor prevailed at trial.  *Id.*  On appeal, the Court also rejected the *in pari delicto* defense, albeit on different grounds than the lower court.  The *Adams* Court held that "the trustee in bankruptcy, and not the [debtor], is the real party in interest as plaintiff." *Id.* at 465-66, 615 A.2d at 612.  It explained, *id.* at 477, 615 A.2d at 617-18:

> By raising cries of unclean hands and in pari delicto, [the defendant] has successfully presented this case as if the only alternatives were either to give [the debtor] the benefit of his fraud or to give [defendant] the benefit of a windfall. What has become obfuscated . . . is that those who are entitled to benefit from the judicial determination of [defendant]'s indebtedness to [the debtor] are the creditors of [the debtor].  His trustee in bankruptcy is the real party in interest in the instant case.  It is not too late to apply and carry out the correct analysis.

---

[16] *In re Bogdan* is distinguishable from this case because in that case the trustee brought suit pursuant to an express assignment from the mortgage lenders.  Nevertheless, *In re Bogdan* counsels against an uncritical application of the *in pari delicto* doctrine to a bankruptcy trustee.

The court remanded the case to the trial court with directions to enter a stay, so as to permit the bankruptcy trustee to determine whether to reopen the estate in order to administer the judgment in the debtor's favor as an asset of the bankruptcy estate. *Id.* at 481, 615 A.2d at 619-20.

As I see it, I need not resolve at this juncture whether an *in pari delicto* or unclean hands defense may be asserted against a bankruptcy trustee. The defenses of *in pari delicto* and unclean hands "involve factual questions," and their "purpose is to protect institutional interests" of the court. *Manown v. Adams*, 89 Md. App. 503, 513, 598 A.2d 821, 826 (1991), *rev'd on other grounds*, 328 Md. 463, 615 A.2d 611 (1992). "'The clean hands doctrine is not applied for the protection of the parties nor as a punishment to the wrongdoer; rather, the doctrine is intended to protect the courts from having to endorse or reward inequitable conduct.'" *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 465, 910 A.2d 1072, 1088 (2006) (citation and some internal quotation marks omitted); *see also Turner v. Turner*, 147 Md. App. 350, 419, 809 A.2d 18, 58 (2002). And, it is "the judge, who is capable of identifying such interests and weighing them against other considerations, who must determine when the doctrine[s] should be invoked to bar a claim." *Manown*, 89 Md. App. At 513, 598 A.2d at 826.

Because the defenses are highly fact-specific, I will not resolve them at the pleading stage. Even if unclean hands or *in pari delicto* may be asserted against a bankruptcy trustee, the record before me is insufficient to determine whether the defenses should bar the Trustee's claims in this case. The FDIC may reassert its defenses of unclean hands and *in pari delicto* after a factual record has been developed through discovery.

## E.  Implausibility

Finally, the FDIC argues that the Trustee's claims are facially implausible as a matter of law because, in the FDIC's view, the claims hinge upon the notion that "K Bank controlled K

Capital." Motion at 16. To the contrary, as the FDIC points out, K Bank was wholly owned by K Capital. Thus, the receiver argues, K Capital had the capability to dictate the terms of the loans by both entities and to countermand any improper conduct by K Bank. Therefore, in the FDIC's view, "[a]ny 'unfair' or inequitable' loans were the responsibility of K Capital, the corporate parent that controlled K Bank." *Id.* at 21.

I disagree. The gravamen of the Trustee's complaint is that K Bank and K Capital were controlled by the same individuals who, in essence, breached their fiduciary duties as officers of K Capital by conducting the alleged lending scheme at inordinate risk to K Capital and its creditors. There is nothing factually implausible about these contentions. The facts the Trustee alleges may ultimately be disproved, or may not establish legal entitlement to relief on the part of the K Capital bankruptcy estate. But, I do not view the Trustee's allegations as implausible under the *Iqbal*/*Twombly* standard, and will not dismiss the Trustee's complaint on this basis.

## Conclusion

For the foregoing reasons, I will grant the FDIC's Motion in part and deny it in part. In particular, the Trustee's claims for declaratory judgment and constructive trust (Counts III and IV) will be dismissed. The Motion will be denied in all other respects. An Order implementing my ruling follows.


Date:  May 16, 2012                                /s/
                                      Ellen Lipton Hollander
                                      United States District Judge