IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHARLES R. GOLDSTEIN,
Chapter 7 Trustee for K Capital
Corporation,

    *Plaintiff*,

    v.

    Civil Action No. ELH-11-1604

FEDERAL DEPOSIT INSURANCE
CORPORATION,
Receiver of K Bank,

    *Defendant*.

## MEMORANDUM OPINION

For the second time, this Court is faced with a motion to dismiss brought by the Federal

Deposit Insurance Corporation ("FDIC"), defendant, as receiver for K Bank, in connection with

litigation initiated by Charles R. Goldstein (the "Trustee"), plaintiff, the Chapter 7 Trustee for K

Capital Corporation ("K Capital").[1]  K Bank went into receivership on November 7, 2010.  The

next day, November 8, 2010, K Capital, a "bank holding company" that wholly owned K Bank,

filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  *See* Complaint

(ECF 1) ¶¶ 1, 6; *see also In re K Capital Corp.*, Case No. 10-35540 (Bankr. D. Md.).[2]

Thereafter, the Trustee filed this suit against the FDIC, as receiver for K Bank, seeking damages

of at least $20 million and other relief stemming from an alleged improper "scheme" of

---

[1] According to the Trustee, K Bank was initially established in 1961 under the name Key
Federal Savings and Loan Association.  In 1996, it became a non-member bank, chartered by the
State of Maryland, and regulated by the Maryland Department of Labor, Licensing and
Regulation, Office of the Commissioner of Financial Regulation.  *See* ECF 131 ¶ 2; ECF 136
¶ 6.  K Capital Corporation was established as a bank holding company in 1996, under the name
Key Capital Corporation.  *See* ECF 136 ¶ 6.

[2] K Capital was regulated by the Federal Reserve Bank of Richmond.  Its principal asset
was its 100% ownership interest in K Bank.  *See* ECF 131 ¶ 2.

coordinated lending by K Capital and K Bank.  *See, e.g.*, Complaint ¶¶ 6-10, Counts One and Two.[3]

The scheme purportedly enabled K Bank to exceed its lending limitations, by permitting K Bank to extend financing to borrowers at extraordinarily high aggregate loan-to-value ratios of between 95% and over 100%—ratios that K Bank could not have achieved on its own under its charter and within "standard underwriting policies" and "regulatory constraints" applicable to K Bank as a "regulated banking institution."  Complaint ¶¶ 7-9.  According to the Trustee, K Bank and K Capital agreed to share the recoveries from the loans.

As discussed, *infra*, the FDIC moved to dismiss the five-count Complaint on September 30, 2011, pursuant to Fed. R. Civ. P. 12(b)(6).  *See* ECF 9 (Motion to Dismiss).  In a Memorandum Opinion and accompanying Order of May 16, 2012, I dismissed two counts but denied the FDIC's motion as to the remaining three counts.  *See* ECF 18, 19; *see also Goldstein v. F.D.I.C.*, 2012 WL 1819284 (D. Md. May 16, 2012).  Thereafter, the parties engaged in extensive and contentious discovery, involving production by the FDIC of hundreds of thousands of documents.

The FDIC has now filed a second Motion to Dismiss, pursuant to Rules 12(b)(1), 12(c), 12(h)(2)(B), and 12(h)(3) of the Federal Rules of Civil Procedure.  *See* ECF 131 at 1.  The Motion is based on a formal determination made in June 2013 by the FDIC, the "No Value Determination," which concluded that the K Bank receivership has no assets from which to satisfy any claims of general unsecured creditors.  *See* ECF 131-1 ¶ 1.  According to the FDIC, due to that determination, dismissal of the Trustee's Complaint is warranted pursuant to the prudential mootness doctrine and because, absent any actual case or controversy, the Court lacks

---

[3] Mr. Goldstein filed his complaint *pro se*, but is now represented by counsel.  In effect, the suit is a dispute by proxy, with the Trustee standing in the shoes of K Capital and the FDIC standing in the shoes of K Bank.

subject matter jurisdiction. In addition, it contends that the equitable claim for an accounting is barred by 12 U.S.C. § 1821(j) and is otherwise moot. The Trustee opposes the FDIC's Motion, arguing, *inter alia*, that because it has asserted claims for "administrative expenses" and "deposit liabilities" that take priority over claims of general unsecured creditors, its claims survive the No Value Determination. *See* ECF 136 ¶¶ 42-50.

The Motion has been fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6.[4] For the reasons that follow, I will grant the Motion.

### Factual Background[5]

Under the alleged lending "scheme," K Bank would typically lend a borrower between 80% and 90% of the value of real estate used as collateral to secure the loan, and would obtain a first-priority lien on the real estate collateral. Complaint ¶ 13. Simultaneously, K Capital would extend a further loan to the borrower in an amount between 5% and 15% of the value of the collateral, and would receive a second-priority lien on the collateral. *Id.* ¶ 14. K Bank then serviced both loans "on a single loan system." Opp. ¶ 9; *see* Complaint ¶ 16.

The "scheme was fraught with risk" because the borrowers' collateral was so highly leveraged. Complaint ¶ 9. According to the Trustee, the risk fell "disproportionately on K Capital" because, if a borrower defaulted (and the Trustee alleges that the "majority" of the borrowers defaulted), K Capital's junior lien position meant that K Capital would recover nothing unless and until K Bank was repaid in full. *Id.* ¶ 9; *see id.* ¶¶ 10-23. Moreover, the

---

[4] Along with ECF 131 ("FDIC Mot.") and its supporting memorandum (ECF 131-1, "FDIC Mem.") (collectively, the "Motion"), I have considered the Trustee's Opposition (ECF 136, "Opp.") and the FDIC's Reply (ECF 137, "Reply").

[5] The underlying facts and the parties' arguments concerning the FDIC's first motion to dismiss are recounted in this Court's prior Memorandum Opinion, ECF 18. Therefore, I need not restate them in full, and incorporate here by reference the factual summary set forth in ECF 18.

financing extended by K Capital "was not made with economic terms commensurate with the risk." *Id.* ¶ 18. The Trustee contends that the scheme was made possible because although K Capital and K Bank were "nominally independent" of each other, they were "consolidated on an accounting and tax basis," *id.* ¶ 8, and the "boards of K Capital and K Bank were populated by the same individuals who made decisions for both entities, despite conflicting interests." *Id.* ¶ 18. "On information and belief," the Trustee contends that, at the time the loans were made, K Bank and K Capital agreed to "share the proceeds of payments" from each pair of loans or from collateral *pari passu*, *i.e.*, in proportion to each entity's contribution to the total amount loaned to the borrower, at the time any proceeds were received. *Id.* ¶ 19. But, when the borrowers defaulted, "K Capital and its creditors were forced to absorb the loss of loans that primarily were issued for the benefit of K Bank." Opp. ¶ 10.

The Maryland Office of the Commissioner of Financial Regulation closed K Bank on November 7, 2010, and the FDIC was appointed as K Bank's receiver. The FDIC and Manufacturers and Traders Trust Company, Buffalo, New York ("M&T Bank"), entered into a Purchase and Assumption Agreement (the "P&A Agreement"), by which M&T Bank acquired most of the assets of K Bank, including the joint loans. Opp. ¶ 11.[6] According to the Trustee, the joint loans were acquired at "'Book Value,'" which was defined in the P&A Agreement "as the dollar amount of the Accounting Records of the Failed Bank at Bank Closing." *Id.* The Trustee complains that the "FDIC has not provided any consideration or distribution to the K Capital Estate for its share of the Joint Loans sold to M&T Bank." *Id.* ¶ 12.

In February 2011, the Trustee filed a claim in the K Bank receivership with respect to approximately 90 improper "joint loans" with various borrowers. The claim was later

_____

[6] As noted, *infra*, the P&A Agreement is not expressly discussed in the Complaint. But, the Complaint states that "FDIC transferred many of K Bank's assets to M&T Bank Corporation." Complaint ¶ 39.

supplemented. In April 2011, the FDIC-Receiver disallowed the claim. FDIC Mem. ¶ 7. This suit followed in June 2011, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 189 (1989) (codified in Title 12 of the United States Code).

Based on these allegations, the Trustee, in the exercise of his duty to administer the estate of K Capital for the benefit of its creditors, *see* Complaint ¶ 5, asserted five claims against the FDIC in its capacity as receiver for K Bank: unjust enrichment (Count One); promissory estoppel (Count Two); declaratory judgment (Count Three); constructive trust (Count Four); and accounting (Count Five). All of the counts are founded on Maryland common law, and are premised on the proposition that each pair of loans issued by the two entities as part of the alleged "scheme" should be treated as a *de facto* "joint loan," Complaint ¶ 11, and that the K Capital bankruptcy estate is entitled to recover from any proceeds of the subject loans received by the FDIC or K Bank in proportion to the amount of funding provided by K Capital for each "joint loan."[7]

As noted, the FDIC filed an earlier motion to dismiss on September 30, 2011. *See* ECF 9. Relying on Rule 12(b)(6), the FDIC argued, *inter alia*, that the Trustee's claims were barred

---

[7] Subject matter jurisdiction is based on 12 U.S.C. § 1821(d)(6), which establishes subject matter jurisdiction over a claim against the FDIC as receiver of a depository institution "in the district . . . court of the United States for the district within which the depository institution's principal place of business is located." A civil action under § 1821(d)(6) must be filed within sixty days after the FDIC's denial of the plaintiff's claim. Here, the Complaint does not expressly allege that the claim was submitted to the FDIC and denied. However, the FDIC concedes that the Trustee satisfied this condition precedent. See FDIC Mem. ¶ 7.

Substantive state law ordinarily governs claims brought under 12 U.S.C. § 1821 against the FDIC as receiver of a failed financial institution. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) ("§ 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent [bank], to work out its claims under state law, except where some provision in [federal law] provides otherwise").

by the *D'Oench, Duhme* doctrine[8] and its statutory counterparts, 12 U.S.C. §§ 1821(d)(9)(A) and 1823(e); that his claims were barred by FIRREA's "anti-injunction" provision, 12 U.S.C. § 1821(j), and by the equitable doctrines of unclean hands and *pari delicto*; and that his claims were facially implausible. *See* ECF 18 at 5, 14, 27, 32-33. In a Memorandum Opinion of May 16, 2012 (ECF 18), I dismissed the Trustee's claims for declaratory judgment (Count Three) and a constructive trust (Count Four), on the ground that they are barred by 12 U.S.C. § 1821(j). But, I otherwise denied the FDIC's motion. *See id.* at 33; *accord* ECF 19 (Order of May 16, 2012).

**Discussion**

A.  Standard of Review

1.  Fed. R. Civ. P. 12(c)

The FDIC has moved for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c). Under Rule 12(h)(2)(B), a defendant may assert "failure to state a claim upon which relief can be granted" in a Rule 12(c) motion. And, a Rule 12(c) motion "for judgment on the pleadings" may be filed "[a]fter the pleadings are closed," so long as it is "early enough not to delay trial."

Courts apply "the same standard for Rule 12(c) motions as for motions made pursuant to Rule 12(b)(6)," alleging failure to state a claim. *Burbach Broadcasting Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002); *see Occupy Columbia v. Haley*, --- F.3d ----, 2013 WL 6570949, at *4 (4th Cir. Dec. 16, 2013). Both *Bell Atl Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), make clear that, in order to survive a motion under Rule 12(b)(6) (and thus Rule 12(c)), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil

---

[8] The *D'Oench, Duhme* doctrine takes its name from the Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942).

actions' . . . ."); *see also Simmons v. United Mortg. & Loan Inv.*, 634 F.3d 754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Thus, the defendant's motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure. Under Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the Rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Twombly*, 550 U.S. at 555-56 n.3 (citation omitted). Although a plaintiff need not include "detailed factual allegations," the rule demands more than bald and conclusory accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To meet the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Id.* at 555.

In reviewing a Rule 12(c) motion, like one under Rule 12(b)(6), a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). However, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265,

286 (1986); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, --- U.S. ----, 130 S.Ct. 1740 (2010).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, --- U.S. ----, 132 S.Ct. 1960 (2012). "'Dismissal under Rule 12(b)(6)'"—or judgment for the defendant under Rule 12(c)—"'is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted). *See Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (internal citation omitted).

Generally, in ruling on such a motion, a court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). In considering a challenge to the adequacy of plaintiff's pleading, however, the court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the defendant's motion, "so long as they are integral to the complaint and authentic." *Phillips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. To be "integral," a document must be one "that by its 'very existence, *and not the mere*

*information it contains*, give rise to the legal rights asserted.'" *Chesapeake Bay Foundation, Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted; emphasis in original). And, as discussed, *infra*, the Court may take judicial notice, where appropriate.

## 2. Fed. R. Civ. P. 12(b)(1)

Fed. R. Civ. P. 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. *See Khoury v. Meserve*, 628 F. Supp. 2d 600, 606 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004). "It is well established that before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). Moreover, "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). Pursuant to Rule 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

Once subject matter jurisdiction is challenged, the plaintiff bears the burden of proving that the court has subject matter jurisdiction. *See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999); *see also Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010); *Khoury*, 268 F. Supp. 2d at 606. In ruling on a motion under Rule 12(b)(1), the court "should 'regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Ferdinand-Davenport*, 742 F. Supp. 2d at 777 (quoting *Evans*, 166 F.3d at 647); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991), *cert. denied*, 503 U.S. 984 (1992). A court should grant a Rule

12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647.

B. FIRREA and Distribution Priority

In response to the savings and loan crisis of the 1980s, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (as noted, "FIRREA," codified in Title 12 of the United States Code). *See Sharpe v. FDIC*, 126 F.3d 1147, 1154 (9th Cir. 1997). FIRREA creates a framework for addressing claims against a failed financial institution, and permits the FDIC "to act as receiver or conservator of a failed institution for the protection of depositors and creditors." *Id.* (internal quotations and citations omitted).

In 1993, Congress adopted the National Depositor Preference Amendment to the Federal Deposit Insurance Act. Pub. L. 103–66, § 3001(a), 107 Stat. 312, 336-37; *see MBIA Ins. Corp. v. F.D.I.C.*, 708 F.3d 234, 236 (D.C. Cir. 2013). It establishes the order of priority for payment of claims proven against a receivership estate, codified at 12 U.S.C. § 1821(d)(11)(A). The provision states, in relevant part:

> [A]mounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority:
>
> (i) Administrative expenses of the receiver.
>
> (ii) Any deposit liability of the institution.
>
> (iii) Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).
>
> (iv) Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)).
>
> (v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company).

- 10 -

Notably, no payments may be made to a lower-priority class until all claims of a higher-priority class have been satisfied. *See id.*; *MBIA Ins. Corp. v. FDIC*, 816 F. Supp. 2d 81, 91-92 (D.D.C. 2011) ("The statute sets forth the priority in which claims are paid: 'administrative expenses of the receiver' must be fully satisfied before outstanding deposit liabilities, which must be satisfied before general liabilities."), *aff'd*, 708 F.3d 234 (D.C. Cir. 2013); *see also Placida Prof'l Center, LLC v. FDIC*, 2013 WL 978271, at *10 (11th Cir. Mar. 13, 2013); *Battista v. FDIC*, 195 F.3d 1113, 1118 (9th Cir. 1999). Where the FDIC acts as receiver for a failed institution, its liability is limited to the amount that a claimant would have received if the failed bank's assets were liquidated. 12 U.S.C. § 1821(i)(2). Put another way, if no receivership assets are available to satisfy the claims of creditors, the creditors cannot recover from the FDIC as receiver. *First Indiana Fed. Sav. Bank v. FDIC*, 964 F.2d 503, 507 (5th Cir. 1992) ("In enacting FIRREA, Congress unequivocally expressed its intent to limit the maximum liability of the FDIC to the amount the claimant would have received in a liquidation under federal priority regulations.").

## C.  The FDIC's Second Motion to Dismiss

The FDIC's Motion is premised on a determination by the FDIC, dated June 5, 2013, that the K Bank receivership has no assets from which to make any distribution as to claims of general unsecured creditors, and therefore such claims have no value (the "No Value Determination"). FDIC Mem. ¶ 1. This No Value Determination appeared in the Federal Register on June 11, 2013. *See* FDIC Mem. Ex.1 (ECF 131-2, "Determination of Insufficient Assets To Satisfy Claims Against Financial Institution in Receivership," 78 Fed. Reg. 35032-01 (June 11, 2013)). The No Value Determination stated, *inter alia*, *id.* (emphasis added):

The FDIC has determined that insufficient assets exist in the receivership of K Bank, Randallstown, Maryland, to make any distribution on general unsecured claims, and therefore such claims will recover nothing and have no value.

\* \* \*

On November 5, 2010, K Bank, Randallstown, Maryland, (FIN #10308) was closed by the Maryland Office of Financial Regulation, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as its receiver ("Receiver"). In complying with its statutory duty to resolve the institution in the method that is least costly to the deposit insurance fund (see 12 U.S.C. 1823(c)(4)), the FDIC facilitated a transaction with Manufacturers and Traders Trust Company ("M&T Bank"), Buffalo, New York, to assume all of the deposits (excluding brokered deposits) and most of the assets of the failed institution.

Section 11(d)(11)(A) of the FDI Act, 12 U.S.C. 1821(d)(11)(A), sets forth the order of priority for distribution of amounts realized from the liquidation or other resolution of an insured depository institution to pay claims. Under the statutory order of priority, administrative expenses and deposit liabilities must be paid in full before any distribution may be made to general unsecured creditors or any lower priority claims.

*As of March 31, 2013, the maximum value of assets that could be available for distribution by the Receiver, together with maximum possible recoveries on professional liability claims was $135,461,147. As of the same date, administrative expenses and depositor liabilities equaled $247,721,021, exceeding available assets and potential recoveries by $112,259,874. Accordingly, the FDIC has determined that insufficient assets exist to make any distribution on general unsecured claims (and any lower priority claims) and therefore all such claims, asserted or unasserted, will recover nothing and have no value.*

The crux of the FDIC's argument is that the No Value Determination establishes that the K Bank receivership has no assets with which to make any distribution as to claims of general unsecured creditors, and therefore the Trustee's claims have no value. *See* FDIC Mem. ¶ 1. As the FDIC explains, "even if, *arguendo*, the Trustee could establish that the bankruptcy estate of [K Capital] is entitled to a claim for damages against the receivership based upon the pre-receivership actions of K Capital and K Bank, which the Trustee cannot, there are no funds to pay the Trustee's claims and his claims are therefore moot." *Id*. In the FDIC's view, the

Complaint's remaining claims should be dismissed because subject matter jurisdiction is lacking absent an actual case or controversy, and, alternatively, the prudential mootness doctrine counsels in favor of dismissal. *See id.* ¶¶ 1, 13-32. Additionally, the FDIC maintains that the Trustee's equitable claim for accounting should be dismissed under a bar on equitable claims, found in 12 U.S.C. § 1821(j), and because that claim is also moot. *See id.* ¶¶ 1, 33-34.

The Trustee contends that it is not a general creditor, and objects both to the timing and to the substance of the FDIC's Motion. Regarding the timing, the Trustee asserts that a motion to dismiss is improper at this stage. *See* Opp. ¶¶ 2, 32-35. As for the merits of the FDIC's contentions, the Trustee insists that his "damages are not limited to those that would render it an unsecured creditor, and, as such, the No Value Determination does not render the Trustee's claims moot." *Id.* ¶ 2; *see id.* ¶¶ 40-52.[9]

According to the Trustee, his "potential damages are ***not*** based on pre-receivership obligations of the failed institution, which would place him in the position of a general creditor,

_____

[9] The Trustee maintains, *inter alia*, that his damages are not limited to receivership certificates. *See id.* ¶ 40 (heading). In an action such as this, filed under 12 U.S.C. § 1821(d)(6) against the FDIC as receiver of a failed bank, the FDIC is permitted to satisfy monetary damages claims by issuance of receivership certificates. *See, e.g.*, *Battista*, *supra*, 195 F.3d at 1116 ("There is no question that the FDIC may pay creditors with receiver's certificates instead of with cash."); *Adagio Inv. Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71, 74 n.4 (D.D.C. 2004); *Franklin Bank v. FDIC*, 850 F. Supp. 845, 847-49 (N.D. Cal. 1994). A claimant whose claim is satisfied by issuance of a certificate may ultimately receive monetary payments from the FDIC, potentially up to the amount of the certificate, as and to the extent that the assets of the bank are distributed by the receiver according to a statutory system of priority established by 12 U.S.C. § 1821(d)(11)(A).

Neither party argues that the recipient of a receivership certificate is entitled to a distribution priority above that of a general creditor. The FDIC insists that, in the prior Memorandum Opinion, this Court concluded that the FDIC may satisfy the Trustee's claims to monetary damages through receivership certificates. *See* FDIC Mem. ¶ 1 n.3 (citing ECF 18 at 18 n.9), ¶ 17 (same). I agree with the Trustee, however, that the footnote the FDIC cites (footnote 9 in ECF 18) should not be construed as a bar to recovery for "administrative expenses" or "deposit liabilities," in the event such recovery is shown to be warranted. *See* Opp. ¶ 42 n.7.

but rather on: (1) **funds that belonged to K Capital** and that never should have been retained by K Bank in the first instance; and (2) K Capital's share of the **post-receivership value** that FDIC received from M&T Bank under the Purchase and Assumption Agreement." *Id.* ¶ 42 (emphasis in original). Moreover, the Trustee maintains that the No Value Determination does not undermine his entitlement to an accounting, and posits that this Court has already rejected the FDIC's argument regarding the accounting claim. *See id.* ¶¶ 2, 53-55. Therefore, the Trustee urges the Court to deny the FDIC's Motion or, "in the alternative," asks the Court to "hold the matter in abeyance and permit the Trustee to engage in discovery regarding its distribution priority and the FDIC's claimed basis for the No Value Determination." *Id.* at 22 (Conclusion); *see also id.* ¶ 52.

The FDIC counters, *inter alia*, that a court *must* dismiss a case where subject matter jurisdiction is absent. Reply ¶ 2. It disputes the Trustee's claim that discovery is needed to assess the validity of the No Value Determination, claiming it is immune from a collateral attack in this suit. *Id.* ¶ 3. Further, the FDIC argues that the Trustee has sought "to recast the . . . Complaint from one seeking damages for the receivership actions of K Bank (which, if proven, would constitute a general unsecured claim) to one seeking priority administrative and/or deposit claims against the receivership." *Id.* ¶ 4. According to the FDIC, the Complaint does not allege facts to support a viable "administrative expense" or "deposit liability" claim. *Id.*

### D.  Preliminary Issues

#### 1.  Procedural objections to the FDIC's Motion

As noted, the Trustee raises several arguments challenging the FDIC's filing of a motion to dismiss at this stage of the litigation, characterizing the Motion as "the culmination of a nearly year-long cat-and-mouse game," in which the Trustee expended "substantial resources of the

bankruptcy estate" in an attempt to analyze "*independently*" the "financial status" of the receivership. Opp. ¶ 1. It asserts: "To reward the FDIC for its behavior at great expense to the K Capital estate would be a travesty." *Id*.

First, the Trustee asserts that the timing of the FDIC's Motion renders it "procedurally improper." *See* Opp. ¶ 2. As noted, the FDIC's earlier motion to dismiss was founded on Rule 12(b)(6); the pending Motion is founded on Rules 12(b)(1), 12(c), 12(h)(2)(B), and 12(h)(3). *See* FDIC Mot. at 1. The Trustee's objections to the timing of the Motion are unavailing.

As noted, the FDIC invokes Rule 12(b)(1), which pertains to motions to dismiss for lack of subject matter jurisdiction. *See Khoury*, *supra*, 628 F. Supp. 2d at 606. The FDIC correctly observes that a challenge to subject matter jurisdiction may be raised at any time. As the Fourth Circuit has said, "a motion to dismiss under Rule 12(b)(1) is nonwaivable and may be brought at any time—even on appeal—regardless of whether a litigant raised the issue in an initial pleading." *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006); *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Martinez v. Duke Energy Corp.*, 130 F. App'x 629, 634 (4th Cir. 2005) ("[A] federal court is obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction."); *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) ("questions of subject matter jurisdiction may be raised at any point during the proceedings").

The FDIC also bases its Motion on Rule 12(c). As already established, the standard of review with regard to a Rule 12(c) motion is the same as that for a motion under Rule 12(b)(6). *Occupy Columbia*, 2013 WL 6570949, at *4. And, as also noted, pursuant to Rule 12(c), "a

party may move for judgment on the pleadings," "[a]fter the pleadings are closed," so long as the motion is brought "early enough not to delay trial." Accordingly, a Rule 12(c) motion is timely.

The Trustee's citation of *Lane v. Wynne*, 2006 WL 4711891 (D. Md. Jun. 23, 2006), *aff'd*, 218 F.App'x 262 (4th Cir. 2007), in support of his challenge to the timing of the FDIC's Motion, does not alter that conclusion. *See* Opp. ¶ 33. As the district court observed in *Lane*, an untimely motion to dismiss under Rule 12(b) "can be treated as a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c)." 2006 WL 4711891, at *2.

Further, when considering a motion to dismiss (or a Rule 12(c) motion for judgment on the pleadings), a court may take judicial notice of a public document, without converting the motion into one for summary judgment. *See, e.g.*, *Armbruster Products, Inc. v. Wilson*, 35 F.3d 555 (Table), 1994 WL 489983, at *2 (4th Cir. 1994) ("The consideration of judicially noticed facts does not transform a motion for judgment on the pleadings into a motion for summary judgment."); *Ancient Coin Collection Guild v. U.S. Customs and Border Protection*, 801 F. Supp. 2d 383, 410 (D. Md. 2011); *Lefkoe v. Jos. A. Bank Clothiers*, 2008 WL 7275126, at *3-4 (D. Md. May 13, 2008); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts addressing a Rule 12(b)(6) motion to dismiss may consider "matters of which a court may take judicial notice"); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir.), *cert. denied*, --- U.S. ----, 132 S.Ct. 115 (2011); *Demetry v. Lasko Products, Inc.*, 284 F. App'x 14, 15 (4th Cir. 2008); *Calhoun-El v. Maynard*, 2013 WL 3280012, at *2 (D. Md. Jun. 25, 2013).

Of import here, the contents of the Federal Register are appropriate for judicial notice. *See United States v. Ahlstrom*, 530 F. App'x 232, 239 n.5 (4th Cir. 2013) ("'The contents of the Federal Register shall be judicially noticed . . . .'") (quoting 44 U.S.C. § 1507). In *Ancient Coin*

*Collectors Guild*, 801 F. Supp. 2d at 410, Maryland District Judge Catherine Blake said: "[T]he contents of the Federal Register are the type of public records subject to judicial notice."

Courts routinely take judicial notice of no value determinations when ruling on motions to dismiss. *See, e.g.*, *Zarate v. Amtrust Bank*, 2013 WL 5934316, at *3 (E.D. Cal. Nov. 1, 2013) (taking judicial notice of various documents, including "contents from the Federal Register"); *Kosnitzky v. F.D.I.C.*, 2012 WL 4127327, at *1 (S.D. Fla. 2012) (taking judicial notice of no value determination); *Deutsche Bank Nat. Trust Co. v. F.D.I.C.*, 854 F. Supp. 2d 756, 760 n.2 (C.D. Cal. 2011) ("The Court can properly take judicial notice of the Federal Register notice announcing the FDIC's determination that the IndyMac receivership estate has insufficient assets to pay anything on general unsecured claims."); *Rogers v. FDIC as Receiver for Downey Savings and Loan*, 2011 WL 2433647, at *2 n.5 (E.D. Cal. 2011) ("The undersigned grants judicial notice of the No Value Determination as it has been published in the federal register and cannot be the subject of legitimate dispute.").[10]

As explained above, it is well settled that courts may consider public records subject to judicial notice when addressing a jurisdictional challenge or a motion for judgment on the pleadings. Thus, the No Value Determination, which appeared in the Federal Register, is subject to judicial notice and may be considered by me without converting the Motion to one for summary judgment.

---

[10] The Trustee cites *A. S. Abell Co. v. Baltimore Typographical Union No. 12*, 338 F.2d 190, 193 (4th Cir. 1964), for the proposition that, "[o]n a motion for judgment on the pleadings made pursuant to Rule 12(c), only the pleadings are considered." *See* Opp. ¶ 34 (discussing *A. S. Abell Co.*). However, the material at issue in that case amounted to a proffer of factual evidence concerning the parties' bargaining history. *See* 338 F.2d at 192-93.

## 2. Validity and consequences of No Value Determination

The Trustee challenges the Motion based on what he characterizes as the "newly minted No Value Determination." Opp. ¶ 33. To the extent the Trustee challenges the No Value Determination's accuracy or validity, this suit is an improper vehicle to do so. "As a final agency action, the No-Value Determination is subject to challenge only pursuant to the APA, and is not subject to collateral attack through individual lawsuits against the FDIC." *Bank of America, N.A. v. F.D.I.C.*, --- F. Supp. 2d ----, 2013 WL 4505424, at *6 (D.D.C. Aug. 26, 2013). *See, e.g.*, *South Miami Holdings, LLC v. F.D.I.C.*, --- F. App'x ----, 2013 WL 4046717, at *4 (11th Cir. 2013) (stating that the FDIC's determination that claims of general unsecured creditors have no value "is a final agency action, and is therefore subject to challenge only pursuant to the [APA]").

In *South Miami Holdings, LLC*, the Eleventh Circuit explained: "The FDIC's finding that claims such as those raised in [the] complaint are worthless is therefore binding on this Court and is preclusive as to whether there are now or ever will be assets sufficient to satisfy the claims." *Id.* Numerous other cases are to the same effect. *See, e.g.*, *281-300 Joint Venture v. Onion*, 938 F.2d 35, 38 (5th Cir. 1991) ("findings and conclusions regarding the worthlessness of unsecured creditor claims constitute final agency action" that "are subject to review under the [APA]"), *cert. denied*, 502 U.S. 1057 (1992); *Zarate*, 2013 WL 5934316, at *4 n.7; *Haggard v. Ossege*, 2011 WL 4711926, at *2 (S.D. Ohio Oct. 4, 2011); *Deutsche Bank Nat'l Trust Co.*, 854 F. Supp. 2d at 760 n.2 (FDIC's no-value determination is binding and not subject to challenge); *Nasoordeen v. F.D.I.C.*, 2010 WL 1135888, at *8 (C.D. Cal. Mar. 17, 2010) (a no value determination is "conclusive and binding on the court").

The Trustee's suggestion that it would constitute "a travesty" to grant a motion to dismiss at this stage of these proceedings also rings hollow. *See* Opp. ¶ 1. Other courts have granted motions to dismiss based on a no value determination that has arisen during the litigation process. *See, e.g.*, *Kosnitzky*, 2012 WL 4127327, at *1 (granting motion to dismiss after FDIC made no value determination "well into the course of the proceedings before this Court"); *Bank of America, N.A.*, 2013 WL 4505424, at *2 (granting motion to dismiss based on no value determination made by FDIC after discovery commenced).

The question, then, is whether dismissal is appropriate, as the FDIC urges, based on principles of constitutional mootness and prudential mootness. *See* FDIC Mem. ¶ 13.

Under the principle of constitutional mootness, "'[f]ederal courts have no jurisdiction to decide moot cases because of the case or controversy requirement of Article III of the Constitution.'" *Baltimore Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456, 461 (D. Md. 2000) (quoting *Virginia ex rel. Coleman v. Califano*, 631 F.2d 324, 326 (4th Cir. 1980)); *accord Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 706 (D. Md. 2008), *aff'd*, 419 F. App'x 381 (4th Cir. 2011). The doctrine of prudential mootness provides that a court may "determine that, regardless of constitutional mootness, a case is moot because the court cannot provide an effective remedy and because it would be imprudent for the court to hear the case." *Feldman*, 579 F. Supp. 2d at 706 (citing *United States v. Under Seal*, 757 F.2d 600, 603 (4th Cir. 1985)). *See also, e.g.*, *MBIA Ins. Corp.*, *supra*, 708 F.3d at 245 ("'Where it is so unlikely that the court's grant of [a remedy] will actually relieve the injury,' the doctrine of prudential mootness permits the court in its discretion to 'stay its hand, and to withhold relief it has the power to grant' by dismissing the claim for lack of subject matter jurisdiction[.]") (citations omitted).

In *S-1 and S-2 v. Spangler*, 832 F.2d 294, 297-98 (4th Cir. 1987), the Fourth Circuit identified three relevant "concerns" that could support a finding of prudential mootness: (1) "the specific relief sought . . . no longer has sufficient utility to justify decision of [the] case on the merits"; (2) "the difficulty and sensitivity of the constitutional issue at the core of [the] controversy"; and (3) the issues raised are not "capable of repetition yet likely to evade review" and thus do not "require immediate resolution." *See also Feldman*, 579 F. Supp. 2d at 707 (recognizing three factors relevant to prudential mootness: "(1) the court's inability to give an effective remedy because of developed circumstances; (2) the sensitivity and/or difficulty of the dispositive issue; and (3) the likelihood that the challenged act would recur and evade review") (citing, *inter alia*, *Under Seal*, 757 F.2d at 603; internal quotation marks omitted).

Where the FDIC has determined that a plaintiff's claims are worthless, courts have dismissed such claims on grounds of subject matter jurisdiction, prudential mootness, or both. *See, e.g.*, *Zarate*, 2013 WL 5934316, at \*4 (granting FDIC motion on subject matter jurisdiction grounds); *Bank of America, N.A.*, 2013 WL 4505424, at \*1 ("Because the . . . receivership will never have the assets necessary to satisfy a judgment in [plaintiff's] favor, this Court lacks subject matter jurisdiction over [plaintiff's] claims. What is more, the claims against the receivership are prudentially moot."); *Deutsche Bank Nat'l Trust Co.*, 854 F. Supp. 2d at 760 n.2 ("Because the FDIC's no-value determination is binding, Deutsche Bank cannot challenge it to avoid prudential mootness."); *MBIA Ins. Corp.*, *supra*, 816 F. Supp. 2d at 101-02 (dismissing claims against FDIC on prudential mootness grounds); *Nasoordeen*, 2010 WL 1135888, at \*10 (same). *See also F.D.I.C. v. Kooyomjian*, 220 F.3d 10, 14-15 (1st Cir. 2000) (affirming summary judgment for FDIC on prudential mootness grounds, explaining that FDIC's worthlessness determination "precludes any relief for defendants even [if] they were successful

on their negligence claim and obtained a favorable judgment"); *Adams v. Resolution Trust Corp.*, 927 F.2d 348, 354 (8th Cir. 1991) (affirming dismissal of common law fraud claims against FDIC's statutory predecessor, the Federal Savings and Loan Insurance Corporation ("FSLIC"), on prudential mootness grounds, following FSLIC's determination that a failed institution's "assets were insufficient to meet the claims of general creditors").

Applying these principles, the No Value Determination concerning the assets of the K Bank receivership establishes conclusively that general creditors will be unable to recover any value. *See* 12 U.S.C. § 1821(i)(2) (limiting FDIC's liability to amount equal to value of failed institution's assets and liabilities). Unless the Trustee is entitled to damages that are not precluded by the No Value Determination, dismissal is warranted on grounds of prudential mootness.

## E.  Viability of the Trustee's Claims After No Value Determination

The Trustee insists that his status is not that of a mere general creditor. The core dispute focuses on the Trustee's status, and whether the Trustee has alleged damages that, despite the issuance of the No Value Determination, are recoverable, if proved.

The essential allegations of the Trustee's Complaint are as follows, *id.* ¶¶ 7-9:

> 7.  Notwithstanding that K Bank and K Capital were nominally separate corporate entities, they joined together in a scheme to act as one unified entity, ignoring corporate formality and creditors' interests, by engaging in the loan transactions that are the subject of this Complaint . . . .

> 8.  This scheme required the complicity of K Capital, and that complicity was achieved by the fact that the boards of the two nominally independent entities were populated by the same individuals who made decisions for both entities, despite conflicting interests. Furthermore, the two entities were consolidated on an accounting and tax basis.

> 9.  As part of the scheme, K Bank and K Capital each made simultaneous loans to the same borrowers, resulting in K Bank having a first position lien and K Capital a second position lien on the real estate collateral

securing the loans. Together, K Bank and K Capital provided the borrowers nearly 100% financing, and in some cases, greater than 100% financing, for the borrowers' projects. K Bank could not have provided this level of loan-to-value lending on its own as the loans would not have been in compliance with their internal underwriting policies. This scheme was fraught with risk, risk cognized in the standard underwriting policies that prevented K Bank from lending 95% or more of the value of the collateral on its own. Not surprisingly, the majority of these loans defaulted and the risk became reality. The fact that K Capital holds a second position on these liens, means that risk has fallen and will continue to fall disproportionately on K Capital.

The Trustee further alleges: "On information and belief, at the time the loans were initially funded, K Bank had promised or otherwise agreed to share the proceeds of payments on the Joint Loans and/or collateral *pari passu* with K Capital based on the percentage each party contributed to the total loan, at the time the proceeds were received." *Id.* ¶ 19.

The allegations seek recovery based on breaches of one or more pre-receivership agreements between K Bank and K Capital. In particular, the allegations are premised on a claim that "K Bank and K Capital . . . joined together in a scheme to act as one unified entity" when engaging in loan transactions with third-party borrowers. Complaint ¶¶ 7-9. As noted, the Trustee alleges that, "*at the time the loans were initially funded*, K Bank had *promised or otherwise agreed* to share the proceeds of payments on the Joint Loans and/or collateral *pari passu* with K Capital . . . ." *Id.* ¶ 19 (first two emphases added).

In his Opposition, the Trustee maintains that K Bank and K Capital entered into an "Intercompany Operating Agreement," which, according to the Trustee, is a written agreement that established the *pari passu* sharing of loan proceeds. *See* Opp. ¶ 5. The FDIC apparently has not located any "Intercompany Operating Agreement" between K Bank and K Capital, which would have predated the K Bank receivership.[11]

---

[11] In response to a discovery dispute, Magistrate Judge Gallagher stated in a letter to counsel dated January 31, 2013, that the Trustee "has not established that the 'Intercompany Operating Agreement' ever came into the custody of [the FDIC], or that there is any reason to

As noted, pursuant to 12 U.S.C. § 1821(d)(11)(A), distributions of assets are to be made in the following order of priority: (1) administrative expenses of the receiver, (2) any deposit liability of the institution, (3) any other general or senior liability of the institution, (4) any obligation subordinated to depositors or general creditors, and (5) any obligation to shareholders. The No Value Determination made clear that, because administrative expenses and depositor liabilities exceed potentially available assets, general unsecured creditors will be unable to recover from the K Bank receivership. *See* FDIC Mem. Ex.1 (No Value Determination).

As a general rule, a plaintiff's claim based upon the breach of a pre-receivership agreement—regardless of whether that breach occurs pre- or post-receivership—constitutes a third-tier, general unsecured claim. *See Deutsche Bank Nat. Trust Co.*, 854 F. Supp. 2d at 758-59, 767. Notably, the Trustee concedes that a claimant with an interest in a pre-receivership obligation of K Bank is in the position of a general creditor. *See* Opp. ¶ 42 ("the Trustee's potential damages are ***not*** based on pre-receivership obligations of the failed institution, which would place him in the position of a general creditor") (emphasis in original). That concession is well founded. *See Deutsche Bank Nat. Trust Co.*, 854 F. Supp. 2d at 767.

Notwithstanding the allegations in the Complaint (and the Opposition), as well as the Trustee's concession that a breach of a pre-receivership agreement results in a general unsecured claim, the Trustee insists that his claims survive the No Value Determination. Specifically, according to the Trustee, his claims are recoverable as "administrative expenses" or "deposit liabilities," which take priority over claims of general unsecured creditors. I address those arguments in turn.

---

believe that the document now resides in [the FDIC's] files." ECF 68 at 2, 3 (denying relevant portions of the Trustee's motion to compel, ECF 59).

<u>1. The Trustee's claim for "administrative expenses"</u>

First, the Trustee contends that his damages may be properly classified as "administrative expenses." *See, e.g.*, Opp. ¶¶ 45, 50. Under the statutory distribution scheme, the "administrative expenses of the receiver" take priority over liabilities for deposits and general unsecured creditors. 12 U.S.C. § 1821(d)(11)(A). In enacting the priority provision, "Congress observed that administrative expenses of the receiver are a narrowly drawn category limited to 'ordinary and necessary expenses of the failed institution . . . , but only those that the receiver determines are necessary to maintain services and facilities to effect an orderly resolution of the institution.'" *MBIA Ins. Corp.*, 816 F. Supp. 2d at 92-93 (quoting H.R. Rep. No. 103–213 (1993) (Conf. Rep.), *reprinted in* 1993 U.S.C.C.A.N. 1088, at 1125).

FDIC regulations define "administrative expenses" as follows, 12 C.F.R. § 360.4:

> The priority for administrative expenses of the receiver, as that term is used in section 11(d)(11) of the Act (12 U.S.C. 1821(d)(11)), shall include those necessary expenses incurred by the receiver in liquidating or otherwise resolving the affairs of a failed insured depository institution. Such expenses shall include pre-failure and post-failure obligations that the receiver determines are necessary and appropriate to facilitate the smooth and orderly liquidation or other resolution of the institution.

The Trustee has raised no allegation either that the FDIC "incurred" any "necessary expenses" owed to the Trustee (or K Capital), or that the FDIC determined that any obligations to the Trustee were "necessary and appropriate to facilitate" the liquidation of K Bank. Instead, the Trustee has identified two bases for damages that would place him above a general creditor. *See* Opp. ¶ 42.

In connection with the Trustee's claim to entitlement for "administrative expenses," the Trustee relies on the second aspect: "K Capital's share of the ***post-receivership value*** that FDIC received from M&T Bank under the Purchase and Assumption Agreement." *Id*. ¶ 42 (emphasis

in original); *see id.* ¶¶ 45-46.   Under the P&A Agreement, the Trustee explains, M&T Bank acquired most of K Bank's assets, "including most or all of the Joint Loans."  *See id.* ¶ 11; *see also* No Value Determination (ECF 131-2, stating: "[T]he FDIC facilitated a transaction with [M&T Bank], to assume all of the deposits (excluding brokered deposits) and most of the assets of the failed institution.").   According to the Trustee, the value that the FDIC retained under that P&A Agreement qualifies as an "administrative expense."  *See* Opp. ¶ 45.

In support of that argument, the Trustee invokes 12 U.S.C. § 1821(e)(7), titled: "Provisions applicable to service contracts."  *See id.*   This provision applies to "contracts for services between any person and any depository institution" for which the FDIC "has been appointed conservator or receiver[.]"   *See* § 1821(e)(7)(A)-(B).   Subsection (A) addresses "[s]ervices performed before appointment" of a receiver, whereas subsection (B) concerns "[s]ervices performed after appointment and prior to repudiation" of a contract.

The Trustee cites subsection (B), asserting that where the FDIC "accepts performance on an agreement entered into by the failed institution, the liability for such payments 'shall be treated as an administrative expense' of the receivership."  Opp. ¶ 45 (quoting 12 U.S.C. § 1821(e)(7)(B)(ii)). Subsection (B) of § 1821(e)(7) provides, *id.*:

> (B) Services performed after appointment and prior to repudiation
>
> If, in the case of any contract for services described in subparagraph (A), the conservator or receiver accepts performance by the other person before the conservator or receiver makes any determination to exercise the right of repudiation of such contract under this section--
>
> (i) the other party shall be paid under the terms of the contract for the services performed; and
>
> (ii) the amount of such payment shall be treated as an administrative expense of the conservatorship or receivership.

As an initial matter, the Complaint makes no mention of the P&A Agreement. Instead, in the context of the now-dismissed constructive trust claim in Count Four, it merely notes that the "FDIC transferred many of K Bank's assets to M&T Bank Corporation." Complaint ¶ 39. The Trustee's reliance on the P&A Agreement is questionable, as "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). Even setting aside that barrier, the Trustee's argument suffers from several flaws.

For one, the text of 12 U.S.C. § 1821(e)(7) indicates that it applies to agreements "entered into by the failed institution"—in other words, pre-receivership agreements—and not to agreements entered into by the FDIC as receiver for the failed institution. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 579 (5th Cir. 2000) (§ 1821(e)(7) "function[s] to guarantee payment under *existing* service contracts to those individuals who perform services for a failed, and liquidating, institution") (emphasis added). Under that interpretation, the P&A Agreement plainly would not qualify as one "entered into by the failed institution." *See* § 1821(e)(7).

Even if the P&A Agreement constitutes a contract entered into by the failed institution, however, the Trustee does not explain either what "services" the Trustee (or K Capital) performed after the FDIC was appointed as receiver or how the FDIC accepted performance by the Trustee (or K Capital). Nor does it explain how the *Trustee* could be owed payment as an

administrative expense for services rendered by others, including by M&T Bank, pursuant to the P&A Agreement. *Cf. MBIA Ins. Corp.*, *supra*, 708 F.3d at 237 ("[I]f, pursuant to a contract for services of the failed institution, the conservator or receiver 'accepts performance' before deciding to repudiate that contract, the payment *to the counterparty under the contract for the services performed* is 'treated as an administrative expense of the conservatorship or receivership.'" (quoting § 1821(e)(7)(B)) (emphasis added). As a result, the Trustee has not plausibly alleged how it is entitled to "administrative expenses."

*Landwehr v. F.D.I.C.*, 734 F. Supp. 2d 161 (D.D.C. 2010), on which the Trustee relies, *see* Opp. ¶¶ 48-50, does not alter that conclusion. In *Landwehr*, the plaintiffs, all former employees of a failed bank, alleged that both their employer and the FDIC, as receiver, had promised that their "'compensation and benefits would remain intact,'" apparently to encourage plaintiffs to continue working when the FDIC assumed control of the bank. *See id.* at 163-64 (quoting complaint). In disputing the FDIC's characterization of their interests as those of a general, unsecured creditor, the plaintiffs argued "that they were provided special promises by the defendants," including by the FDIC itself. *See id.* at 165 (citing plaintiffs' complaint). The court denied the FDIC's motion to dismiss because the FDIC "offered no support for [its] critical assertion" that "the plaintiffs are, at best, general unsecured creditors of the receiverships," and "ha[d] not explained why the plaintiffs' monetary claims do not, as the plaintiffs suggest, constitute a higher priority liability of the receiverships." *Id.* at 166. But, even under those circumstances, the court denied the FDIC's motion, "without prejudice to consideration of a renewed motion addressing why the plaintiffs' claims should be treated as general unsecured claims." *Id.* at 167; *see also MBIA Ins. Corp.*, 816 F. Supp. 2d at 99 n.19 (distinguishing *Landwehr* because, *inter alia*, "the employees' claims were based not only on pre-receivership

contractual arrangements with the bank, but on representations made to them by the FDIC when it was running the bank and on the FDIC's conduct").

Additionally, as the Trustee acknowledges, in *Landwehr* the FDIC "accept[ed] the benefits of plaintiffs' services" for several months, and thus the plaintiffs in that case could plausibly argue that because "the benefit of their services accrued to the FDIC *post-receivership*, they were entitled to a status above general creditors." *See* Opp. ¶¶ 48-49 (emphasis in original). Here, by contrast, the Trustee has made no equivalent allegation concerning any post-receivership services rendered either by the Trustee or by K Capital.

The Trustee also cites a remark made in a Letter to Counsel from Magistrate Judge Stephanie A. Gallagher, dated May 23, 2013, in connection with a discovery dispute that was referred to her. *See* Opp. ¶ 25 n.15 (citing ECF 125, Letter to Counsel). In the context of a dispute regarding deposition topics, Judge Gallagher acknowledged that this Court "may find that [the Trustee] is entitled to a portion of [the FDIC's] sale of the Joint Loans, if there is in fact any value." ECF 125 at 2. Significantly, that letter predated the June 2013 No Value Determination by several weeks, and, as noted, recognized the possibility that no value may exist. *See id.* What is more, the letter contains no suggestion that the Trustee could be entitled to "administrative expenses."

It is also salient that the distribution statute's underlying purpose of protecting depositors counsels against a liberal interpretation of "administrative expenses." In *MBIA Ins. Corp.*, 816 F. Supp. 2d at 93 n.12, the district court reasoned: "[I]t would make little sense if the sophisticated entities that chose to play an active role in the [underlying transactions] and stood to gain if they succeeded could be able to leapfrog ahead of ordinary depositors to recoup their losses when they failed." *See MBIA Ins. Corp.*, 708 F.3d at 245 ("administrative expenses"

should be interpreted in manner consistent with Congress's "depositor preference goal in § 1821(d)(11)").

In my view, the Trustee's allegations fall short of stating a viable claim for "administrative expenses."

2. The Trustee's claim for "deposit liabilities"

Second, the Trustee maintains that "***funds that belonged to K Capital*** and that never should have been retained by K Bank in the first instance" constitute a "deposit," and therefore the Trustee takes priority over general creditor claims. Opp. ¶ 42 (emphasis in original); *see id.* ¶¶ 43-45. As with the Trustee's "administrative expenses" claim, the Complaint makes no mention of deposit liability. *See Mylan Laboratories, Inc.*, 770 F. Supp. at 1068.

The parties agree that the relevant definition of "deposit" is found in 12 U.S.C. § 1813(l). *See* Opp. ¶ 44; Reply ¶ 26. Although the definitions found in that provision are lengthy, they essentially include: (1) "the unpaid balance of money or its equivalent received or held" by a bank "in the usual course of business and for which it has given or is obligated to give credit"; (2) trust funds, defined in § 1813(p) as "funds held by an insured depository institution in a fiduciary capacity," including "funds held as trustee, executor, administrator, guardian, or agent"; (3) money received "in the usual course of business for a special or specific purpose," including but not limited to "escrow funds" and "funds held as security for an obligation due to the bank or savings association or others"; (4) an outstanding draft, cashier's check, money order, or other officer's check; and (5) any other obligation defined by regulation to be deposit liabilities. *See* 12 U.S.C. § 1813(l)(1) - (5).

The Trustee bases his claim to "deposit liabilities" on 12 U.S.C. § 1813(l)(1), one of the five definitional provisions, under which "deposit" includes:

- 29 -

[T]he unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally, to a commercial, checking, savings, time, or thrift account, or which is evidenced by its certificate of deposit, thrift certificate, investment certificate, certificate of indebtedness, or other similar name, or a check or draft drawn against a deposit account and certified by the bank or savings association, or a letter of credit or a traveler's check on which the bank or savings association is primarily liable: *Provided*, That, without limiting the generality of the term "money or its equivalent", any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for checks or drafts or for a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable, or for a charge against a deposit account, or in settlement of checks, drafts, or other instruments forwarded to such bank or savings association for collection.

In his Opposition, the Trustee argues, seemingly for the first time, that K Capital had an interest as a depositor in funds paid by third-party borrowers to K Bank prior to the receivership, which K Bank was allegedly obligated to share with K Capital. *See* Opp. ¶¶ 43-44. The Trustee, however, fails to provide any allegations that establish its entitlement to a "deposit" within the meaning of 12 U.S.C. § 1813(l)(1) and the priority provision found in § 1821(d)(11). There is simply no allegation, in either the Complaint or the Opposition, that K Capital had an interest in any "deposit" for which K Bank "ha[d] given or [was] obligated to give credit" to any "account," or "which [was] evidenced by" a certificate or other qualifying document, pursuant to § 1813(l)(1). Instead, the Complaint's allegations indicate that the Trustee's interest is grounded in a pre-receivership agreement between K Bank and K Capital. Complaint ¶ 19. At most, a breach of such a pre-receivership agreement results in a general unsecured claim. *See Deutsche Bank Nat. Trust Co.*, *supra*, 854 F. Supp. 2d at 758-59, 767.

*F.D.I.C. v. Fedders Air Conditioning, USA, Inc.*, 35 F.3d 18 (1st Cir. 1994), on which the Trustee relies, *see* Opp. ¶ 44, is of limited use to his argument. In *Fedders*, the Bank of New England ("BNE") had signed an escrow agreement acknowledging receipt of a $250,000

"'deposit'" to be held in escrow for Fedders. 35 F.3d at 21. BNE, however, did not actually establish an escrow account. *Id.* at 21. On appeal following a bench trial, the First Circuit concluded: "Although [BNE] failed either to create the account or deposit the money in it, it does appear that it was 'obligated' to give credit to an account for this amount." *Id.* at 22 (quoting 12 U.S.C. § 1813(l)(1)). The First Circuit explained, 35 F.3d at 23 (alterations in original):

> In this case the district court made a specific finding, not challenged by the FDIC on appeal, that Bank of New England "held . . . . a copy [of the escrow agreement] in its records." This agreement, signed on behalf of the bank, explicitly acknowledged "receipt of said amount [$250,000]," denominated the "Deposit"; and the document provided for the deposit to be invested in a "commercial bank money market account" (unless a different investment was approved by Fedders in writing). In other words, the bank's books and records did include evidence of the "deposit."

Thus, the First Circuit held that, under § 1813(l)(1), BNE received "the equivalent of money; that it was held or received by the bank in the usual course of business to support a loan; and that in exchange the bank was 'obligated' to credit an account in the amount of $250,000." *Id.* at 22. Although post-trial evidence is far removed from the contents of a complaint, in this case the Trustee plainly has not raised allegations akin to those found in *Fedders*.[12]

At least one other court has dismissed a complaint following the issuance of a No Value Determination, where the complaint offered no support for a viable "deposit liability" claim. In *Bank of America, N.A.*, *supra*, 2013 WL 4505424, the plaintiff argued in opposing the FDIC's motion to dismiss that its claims were not limited to general unsecured claims, and instead included four varieties of preferred claims, including "deposit liability" claims. *See id.* at *4. To that end, the plaintiff noted that its complaint alleged that it "'timely filed a proof of claim in the Colonial receivership, which sought, *inter alia*, allowance of a general unsecured claim against

---

[12] *U.S. v. Adler*, 186 F.3d 574 (1999), which the Trustee also cites, is inapposite. *See* Opp. ¶ 43. That case, which involved a wire fraud conviction, sheds no light on whether the Trustee's purported interest in proceeds received by K Bank place him in the position of a "depositor."

Colonial.'" *Id.* (citing complaint). According to the plaintiff, because the complaint used the phrase "*inter alia*" in connection with "general unsecured claims," the complaint indicated that plaintiff was also pursuing *other* types of claims—namely, the priority claims, which included a claim based on "deposit liability." *Id.* The court rejected that argument as "borderline frivolous." *Id.* at *5.

Here, the Trustee makes no such textual argument. Nevertheless, as *Bank of America, N.A.* reflects, a court need not accept a plaintiff's assertion that it has stated or is entitled to "deposit liability" or other priority status, where the allegations in the complaint indicate otherwise. *See also Betz v. F.D.I.C.*, 99 F.3d 904, 907 (9th Cir. 1996) (finding that no "deposit" existed under 12 U.S.C. § 1813(l)(1) where plaintiffs "did not surrender nor put any assets or earnings" into the bank, and where bank "was acting as an ordinary party to a contract" vis-à-vis plaintiffs).

The Trustee further insists: "There is no requirement that a complaint address the priority level of claims against a receivership[.]" Opp. ¶ 51. Even if that were so, it is a bridge too far to suggest that the Complaint alleges grounds for "administrative expenses" and "deposit liability," where the facts as alleged would at most allow general creditor claims. Although the Trustee need not supply "detailed factual allegations," Fed. R. Civ. P. 8(a)(2) demands more than conclusory assertions or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC*, 716 F.3d at 350. Under that standard, the Trustee's claim to depositor status must fail.

To be sure, the Trustee may plead his claims in the alternative. *See, e.g.*, *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002). The Trustee has raised an unjust enrichment claim in Count One of the Complaint; the unjust enrichment allegations are not expressly based on any pre-receivership contract or other

agreement between K Bank and K Capital, the breach of which would at most result in general creditor claims. At the same time, the factual allegation that K Bank "promised or otherwise agreed" to share proceeds with K Capital is not confined to the promissory estoppel claim (Count Two). *See* Complaint ¶ 19. Moreover, the Trustee has not articulated how alleging unjust enrichment advances his claims for "administrative expenses" or "deposit liabilities" that are otherwise unsupported by the Complaint's allegations. Accordingly, the unjust enrichment claim does nothing to buttress the Trustee's arguments opposing dismissal.

Having concluded that the Trustee has failed to state viable claims either for "administrative expenses" or for "deposit liabilities, dismissal of Count One (unjust enrichment) and Count Two (promissory estoppel) is appropriate, on grounds of prudential mootness. *See, e.g.*, *Bank of America, N.A.*, 2013 WL 4505424, at *1; *Deutsche Bank Nat'l Trust Co.*, *supra*, 854 F. Supp. 2d at 760 n.2; *MBIA Ins. Corp.*, 816 F. Supp. 2d at 101-02; *Nasoordeen*, *supra*, 2010 WL 1135888, at *10.

### 3.  The Trustee's accounting claim and request for further discovery

The Trustee's remaining requests for relief—the claim for accounting found in Count Five of the Complaint, and the request for further discovery found in his Opposition to the FDIC's Motion—both amount to claims that the Trustee is entitled to further information regarding the financial status of the K Bank receivership. Accordingly, I will address them in tandem.

Regarding the accounting claim (Count Five), the FDIC moves for dismissal under 12 U.S.C. § 1821(j), and on the ground that the claim is moot. *See* FDIC Mem. ¶¶ 1, 22 n.12. I need not address the argument based on 12 U.S.C. § 1821(j), as I conclude that the Trustee's accounting claim is moot.

"Because the relief sought in an accounting claim is access to information, discovery is the remedy given to plaintiffs who prove they are entitled to an accounting." *Golub ex rel. Golub v. Cohen*, 138 Md. App. 508, 523, 772 A.2d 880, 889 (2001). As the FDIC explains, the Trustee's accounting claim is based on his claim for payment of proceeds arising from the scheme between K Bank and K Capital; accounting is necessary, the Trustee says, "*so that it may determine the full extent of the proceeds of payment on the Joint Loans and/or collateral.*'" FDIC Mem. ¶ 29 (quoting Complaint ¶ 44; emphasis in FDIC Mem.). According to the FDIC, the accounting claim is moot because the No Value Determination precludes any monetary recovery for the Trustee. *Id.* ¶ 28.[13]

To the extent the Trustee is arguing that discovery concerning the basis of the No Value Determination is warranted in the context of this case—an individual lawsuit against the FDIC as receiver—that argument lacks merit. *See Kosnitzky*, *supra*, 2012 WL 4127327, at *2 (plaintiff in a lawsuit against FDIC not entitled to discovery to collaterally attack FDIC's no value determination); *Haggard*, *supra*, 2011 WL 4711926, at *2 (same). Nor am I inclined to permit further discovery "regarding [the] distribution priority," absent some indication that the Trustee can plausibly allege that, notwithstanding the No Value Determination, a viable avenue to recovery remains.[14]

---

[13] The FDIC also argues that the exceptions under which a "freestanding claim for an accounting" may be viable do not apply here. *See* FDIC Mem. ¶ 28 (citing *Polek v. J.P. Morgan Chase Bank, N.A*., 424 Md. 333, 36 A.3d 399 (2012)). In response, the Trustee insists that the FDIC's arguments as to the merits of the accounting claim have already been considered and rejected by this Court. *See* Opp. ¶ 54. Because I conclude that the accounting claim is moot, I need not resolve this dispute.

[14] Although the Trustee cites various aspects of discovery that he states are incomplete, *see, e.g.*, Opp. ¶ 4, the FDIC contends that it has produced more than a half million pages of documents, as well as millions of lines of data. *See* Trustee Mem. ¶¶ 10, 31. Those documents include 207,000 pages of K Capital documents, as well as 429,000 pages of additional documents produced in response to the Trustee's requests. *See id.* ¶¶ 5, 10. On April 18, 2013,

Having concluded that the Complaint's allegations do not support recovery of "administrative expenses" or "deposit liabilities," I agree with the FDIC that the accounting claim has been rendered moot.

The only remaining question is whether dismissal with prejudice is warranted. Notably, the Trustee has not filed a motion to amend the Complaint, nor has he requested leave to amend as an alternative to dismissing the Complaint. Instead, the Trustee requests, as an alternative to dismissal, that the Court "hold the matter in abeyance and permit the Trustee to engage in discovery regarding its distribution priority and the FDIC's claimed basis for the No Value Determination." Opp. at 22 (Conclusion). For the reasons explained above, the Trustee has failed to provide a sufficient reason to permit further discovery, given the No Value Determination and the lack of support for recovery of either "administrative expenses" or "deposit liabilities." Accordingly, the Trustee's remaining claims will be dismissed, with prejudice.

## Conclusion

For the foregoing reasons, I will grant the FDIC's motion to dismiss. A separate Order follows.

Date:  January 8, 2014                            _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge

---

the FDIC filed a notice (ECF 111) indicating that its production of documents responsive to the Trustee's requests was complete, "with the exception of documents responsive to those requests to which it has expressly objected to in writing." *See* FDIC Mem. ¶ 10 n.10. Indeed, it is unclear what further document requests—particularly targeting FDIC—or other discovery would yield. To cite an example, one key document the Trustee cites is the purported "Intercompany Operating Agreement" between K Bank and K Capital. Yet, as noted, Judge Gallagher concluded in regard to a discovery dispute that the Trustee "has not established that the 'Intercompany Operating Agreement' ever came into the custody of [the FDIC], or that there is any reason to believe that the document now resides in [the FDIC's] files." ECF 68 (Letter to Counsel dated January 31, 2013) at 2, 3 (denying relevant portions of the Trustee's motion to compel, ECF 59).